**Richard BRIMAGE, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 70105.**

Court of Criminal Appeals of Texas,
En Banc.

Sept. 21, 1994.

Opinion after Grant of Rehearing
Jan. 10, 1996.

Rehearing Denied Feb. 28, 1996.

W.R. Hitchens, Sam R. Fugate, Kingsville, for appellant.

Matthew W. Paul, Asst. State's Atty., Austin (on rehearing), Grant Jones, Former Dist. Atty. (on original submission), Corpus Christi, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Richard Brimage, Jr. was convicted of the offense of murder in the course of committing or attempting to commit kidnapping, a capital offense under V.T.C.A. Penal Code, § 19.03(a)(2). The offense occurred in Kleberg County; trial was had on change of venue to Comal County. The jury answered the special issues affirmatively and punishment was assessed at death in accordance with former Article 37.071, V.A.C.C.P. Appeal to this Court is automatic. *Id.*, § h. In twelve points of error, appellant challenges, *inter alia*, the sufficiency of the evidence to support his conviction and sentence, and the legality of a warrantless search of his home. We will reverse.

### I. Facts

Because appellant challenges the sufficiency of the evidence to uphold both his convic-

---

**1.** Appellant frames his third point of error as a challenge to the trial court's ruling on his motion for instructed verdict. In *Madden v. State,* 799 S.W.2d 683 (Tex.Cr.App.1990), this Court held:
"A challenge to the trial judge's ruling on a motion for instructed verdict is in actuality a challenge to the sufficiency of the evidence to support the conviction. In reviewing the sufficiency of the evidence, we consider all the evidence, both State and defense, in the light most favorable to the verdict. If the evidence is sufficient to sustain the conviction, then the trial judge did not err in overruling appellant's motion."

tion[1] and sentence, a thorough review of the facts of the case is warranted.

Early on Monday morning, October 5, 1987, appellant placed a phone call to Mary Beth Kunkel, a 19–year–old co-ed at Texas A & I University in Kingsville. Appellant was acquainted with Kunkel through his employment at the nearby Lockheed plant; his supervisor there was Kunkel's boyfriend. Appellant's phone call was answered by Kunkel's mother, to whom he misidentified himself as "George." Appellant asked Kunkel to come to his residence on West Richard Street in Kingsville[2] to pick up some drafting tools for her boyfriend. He told her not to tell her mother where she was going. Kunkel left home in her car. She was seen by a friend turning onto West Richard Street shortly before 8 a.m.

Later that day, Kunkel's boyfriend, Michael Beagly, became alarmed when he found her car parked on the Texas A & I campus. The car was parked in a place not frequented by Kunkel and her purse was in the car. Subsequently, a missing persons investigation was begun. By Wednesday, October 7, 1987, the investigation began to focus on appellant. The police knew of his acquaintance with Kunkel; knew that appellant had quit his job without notice; and knew that Kunkel's car had been found on the Texas A & I campus at a location near appellant's residence. Throughout the two days of the investigation neither the police nor appellant's former employers were able to contact him. The police had also been told that the month before appellant had attempted to sexually assault another woman.

Sometime about 11:00 a.m. that Wednesday, police officers acted on their suspicions

---

*Id.,* at 686 & n. 3 (citation omitted). Thus, to address appellant's point of error, we will view all the evidence presented at the guilt phase of the trial.

**2.** Appellant had lived with his parents at the West Richard Street residence since January 1987. Appellant had his own room in the house and had keys to both the house and his parents' cars. Appellant's parents had left a week earlier on an extended vacation, leaving appellant in charge of the house.

and went to appellant's home on West Richard. When no one answered their knocks at the front door, the officers explored the outside of the house, peering through the windows and checking for unlocked doors. The officers found all the doors and windows locked, the garage door down and the lights out. The officers left the West Richard residence satisfied that no one was home. It was at this point that Captain George Gomez, Jr., a detective with the Kingsville Police Department, assumed supervision of the investigation.

That afternoon, Gomez contacted Roy C. Turcotte, a local attorney and a relative of appellant. Gomez told Turcotte that he suspected appellant was involved in Kunkel's disappearance and that he wanted to talk to either appellant or his parents. Gomez also asked Turcotte for permission to search the residence on West Richard Street. Turcotte told Gomez that he would find out how to contact appellant's parents. He also expressly told Gomez that he did not have the authority to consent to a search of the Brimage residence.

After his telephone conversation with Turcotte, Gomez was called out to the Rodeway Plaza Inn, a local motel. He was told appellant had stayed in room 119 the night before and had not been seen since. The owner of the motel provided Gomez with appellant's room registration card and his suitcase, which had been removed from his room earlier in the day.[3] Inside appellant's suitcase, Gomez found a number of pornographic magazines, several items of men's clothing, a piece of an ace bandage, a woman's bra, a pair of women's underwear, pieces of what appeared to have been women's pajama bottoms, a jaggedly cut piece of red cloth that appeared to be blouse material, and a pair of large scissors. Gomez testified that both the red cloth and the scissors were "blood stained." Gomez returned to the police station with the suitcase.

Gomez was met at the station by Turcotte and the Honorable Max Bennett of the 319th District Court in Corpus Christi. Bennett is appellant's maternal uncle. Turcotte had called Bennett earlier and told him of police suspicion of appellant. Bennett had then driven to Kingsville, and the two attorneys had broken into appellant's home. At the police station, the two men told Gomez of their break-in and that there was evidence of "violence" or a "violent act" at the residence. Gomez asked Bennett for permission to search the house, and Bennett replied, "Yes, you need to get in there." Without securing a warrant, the police did just that. See Part III, *post*.

Within an hour, the police entered appellant's house and began an exhaustive search of the premises. They found the master bedroom in a state of disarray. Clothing and other items littered the floor and the bed. A jewelry box had been knocked over. A heavy blanket had been placed over a window otherwise screened by both venetian blinds and drapes.[4] Some of the clothing in

3. Appellant's twelfth point of error challenges the search of his suitcase at the motel as violative of the Fourth Amendment. Testimony at the pretrial hearing established that on October 6, 1987, appellant paid cash in advance for a one-night stay at the motel. Check-out time was noon the following day. On October 7, the motel's housekeeping staff entered appellant's room on three separate occasions in an attempt to clean and prepare it for the next occupants. Each time they found the room in the same condition: Appellant's suitcase and several of his personal papers were in the room and the room key was on top of a dresser. At 3:00 p.m. on October 7, a motel manager had the housekeeper gather all appellant's possessions, pack them in the suitcase and put the suitcase in the motel's lost-and-found storage area.

Later that day a desk clerk from the motel notified police that appellant had stayed there the previous night. Officer Gomez arrived at the motel and searched the contents of the suitcase, having determined that appellant had "abandoned" it. At the conclusion of appellant's pretrial hearing, the trial court found that appellant had in fact abandoned his motel room and the property therein. The trial court found that appellant had no reasonable expectation of privacy in the suitcase, and thus no standing to complain of its seizure. Appellant contests these findings. Because we will reverse on other grounds, we need not address this issue. However, the trial court's findings appear to be in accord with the applicable federal case law. See, e.g., *United States v. Parizo*, 514 F.2d 52 (CA2 1975); *United States v. Croft*, 429 F.2d 884 (CA10 1970).

4. Appellant's father would testify at trial that he and his wife had left the house clean and tidy and without blankets covering the master bedroom window.

the room had been cut up, and blood had been splattered in several places. Not long after the search began, the police found Kunkel's body in the trunk of a car in the garage. The body was unclothed from the waist down and bound at the wrists and elbows. The feet were bound to the elbows behind the body, causing an arching exposure of Kunkel's genital area. A ligature was tightly tied around her neck, and a sock had been forced down her throat.

The police remained at the house for several hours gathering evidence. The search was suspended at approximately 2:00 o'clock that morning, and the house was secured. The police returned the following day to collect more evidence—again, without a warrant.

Based in part on the evidence obtained from the search of the West Richard residence, Kingsville police obtained an arrest warrant for appellant. On Thursday morning, October 8, that warrant was executed in Corpus Christi. While in the Corpus Christi jail awaiting transfer back to Kingsville, appellant was interviewed by an investigator from the district attorney's office. Appellant's written confession provides the most coherent picture of the events preceding Kunkel's death:

"My name is Richard Lewis Brimage, Jr. I am 31 years old and I live at 1135 W. Richard, Kingsville, Texas. Last Thursday, October 1, 1987, I started trying to pick up some girls and party with. This went on through the weekend. On Monday, October 5, 1987 early at about 6 am or 7 am I called Mary Beth Kunkel at home. Her mother ansewered (sic) and I asked for Mary Beth. She came to the telephone and I told her I had some engineering tools for a gift for her boyfriend Mike. I knew if I told her they were for Mike she would come over to my house. She agreed to come over. She came over and I took her to the back bedroom where the tools were. As she looked at tools I grabbed her and she said, What Richard, what.

I was standing behind her and grabbed her by the shoulders. She struggled and started screaming and I forced her into the master bedroom. She continued scream-

ing and I kept hitting her and started chocking her. I wanted her sexually real bad and that is why I lured her to my house. We wrestled for a while and when she would not stop screaming, I finally choked her with my hands. I wasn't sure she was dead, so I started to tie her up up (sic) so she would not struggle anymore. I got some nylons and pulled her feet behind her back. I tied her hands to her feet where she was bent out of shape. I remember seeing blood on her face and blood on my pants.

I want to say that during this time another guy was with me. His name is Leo Molina. Leo had been with me for the past three or four days. I woke him up to tell him Mary Beth was coming over. I told him to wait in the back bedroom where all the struggle took place. While she was screaming we decided to inject her with some cocaine to stop her from screaming. We managed to do so. She kept going wild, trying to escape. I kept telling her to stop screaming. Leo, I remember was trying to feel up her shorts and touch her between her legs. After I was certain she was dead, tied up, I took off her shorts, so I could admire her body. Before this I told Leo to take her car from in front of my house and park it at the college campus somewhere. While Leo was gone I picked up Mary Beth and put her in the trunk of my parents' car."

Appellant's confession was admitted as evidence against him during his trial, which, because of the pervasive publicity generated by the case, was transferred from Kleberg County to Comal County.

Molina, who accepted a plea bargain, offered a significantly different, albeit self-serving, account of the events at appellant's residence. He testified that appellant had sent him to a back room of the West Richard residence because someone was coming over to engage in sex with appellant; that he heard appellant conversing with someone at the front door of the residence; that he heard struggling and saw appellant "dragging a female into the back bedroom[;]" that he heard the female scream, "Please don't hit me. Don't hurt me. I'll do anything[;]" that

responding to appellant's call he went to the master bedroom and saw appellant striking the female; that he saw appellant inject the female with cocaine; and that he fled the back bedroom while the struggle was still going on.

Dr. Joseph Rupp, Medical Examiner for Nueces County, preformed the autopsy on Kunkel's body. He testified that the results of the autopsy were consistent with homicide, and that Kunkel could have died from any one of three causes: (1) manual strangulation; (2) asphyxiation by the sock obstructing her airway; and (3) ligature strangulation. Rupp based that analysis on both his autopsy results and appellant's confession. He testified that he could not determine when, during the assault by appellant, Kunkel had died:

"Q: Would you tell us if you choke somebody with your hands, how long it takes until they—they become unconscious and dead?

A: Well, if you get a good hold and they don't get away momentarily ... and you compress those major (blood) vessels, you have about 15 seconds of consciousness.

\* \* \* \* \* \*

Q: How long until death?

A: [I]f you compress and you lose consciousness in 15 seconds, you will die in a couple of minutes at least.

Q: Now, if I were choking someone, is it possible for me to after they reach unconsciousness become uncertain as to whether I have successfully killed them or not?

A: Absolutely....

\* \* \* \* \* \*

Q: [B]ased on reading [appellant's] confession and doing your autopsy and all of the evidence in the case ... you believe that the strangulation rendered her unconscious and then the sock was applied and then the ligature was applied?

A: Yes.

Q: Okay. Could you actually pinpoint a time of death, Dr. Rupp?

A: No...."

The medical examiner stated that the struggle that precipitated Kunkel's death probably was brief, lasting no more than a few minutes. He said that he found no physical evidence of sexual assault, but that such did not rule out an assault, and he opined that "[t]he sexual nature of the crime [was] obvious because of the positioning of the body and the way the body [was] tied up with the legs spread and the—the—the feet tied back underneath the body with the body arched to expose the genital area."

At the close of the case, the jury was given the statutory definitions of attempt, kidnap, restrain and abduct, and it was charged, *inter alia,* as follows:

"Now, if you find from the evidence beyond a reasonable doubt that on or about October 5, 1987, in Kleberg County, Texas, that the defendant, Richard Brimage, Jr., did then and there intentionally cause the death of an individual, Mary Beth Kunkel, by strangling her with his hands or by strangling her with a ligature, or by suffocating her with a sock, in the course of committing or attempting to commit the kidnapping of Mary Beth Kunkel, then you will find the defendant guilty of capital murder as charged in the indictment."

The jury found appellant guilty of capital murder.

During the punishment phase of the trial, the State re-offered the evidence from the guilt/innocence phase and further called two women to testify about their encounters with appellant. The first woman was a topless dancer at a club in Kingsville. On October 8, 1987, just three days after the murder, appellant was in the club offering dancers money to come "party" with him. None of the dancers accepted appellant's offer. Later that night, appellant called the club asking for this particular woman and again asked if she would come to his motel room; she declined his invitation and never heard from him again.

The second woman to testify was an acquaintance and school mate of appellant and one of his sisters. On September 21, 1987, two weeks before the murder, appellant invited the witness to his house on the pretense of surprising his sister, who he claimed had just returned from a trip. Once the witness

was inside the house, appellant told her his sister was in another room. As she turned toward that room, appellant hit her over the head with an object, knocked her to the ground and jumped on top of her. The witness testified that then "something snapped." Appellant apologized for his behavior, let her up and allowed her to leave. In spite of appellant's requests that she not tell the police, the witness reported the incident. No formal charges were filed.

Apart from the testimony of the two women, the only other evidence the State presented at punishment involved appellant's prior criminal record. The State proved that appellant had twice been placed on probation for offenses in Washington State and Texas. On September 30, 1977, appellant entered a plea of guilty to the offense of possessing stolen property and was placed on deferred adjudication probation for two years. The offense arose out of a purse snatching incident involving an 85–year–old woman in Island County, Washington. While appellant did not commit the actual purse snatching, he was later found to be in possession of jewelry and more than $250 which had been taken from the elderly woman. Appellant successfully completed the two years of probation and was subsequently released from the disabilities of that crime.

Appellant did not fare as well on probation in Texas. On May 5, 1983, appellant entered a plea of guilty to the felony offense of forgery by passing checks.[5] Appellant was sentenced to five years confinement in the penitentiary, but the trial court suspended sentence and placed appellant on probation for a term of five years. Within two and one-half years, appellant's probation was revoked for failure to report to his probation officer, as well as failure to pay a supervisory fee required after his release from Cenikor, a drug rehabilitation center in Houston. Following the revocation, appellant was sentenced to a term of two years in the penitentiary. He was released in January 1987, just ten months before the instant offense.

Neither the State nor appellant offered expert testimony during the punishment phase of the trial. Appellant called as witnesses a number of his relatives and friends, who testified that appellant would not be dangerous in the future. The two special issues of former Article 37.071(b), supra, were submitted to the jury, which answered both in the affirmative. Appellant was sentenced to death in accordance with former Article 37.071(e).

## II. Sufficiency of the Evidence

Appellant contends that the evidence introduced at his trial was insufficient to support both the verdict of guilty and the sentence of death. Specifically, he contends that he did not kidnap or attempt to kidnap Kunkel, see V.T.C.A. Penal Code, § 20.03, and that the evidence failed to show beyond a reasonable doubt that there is a probability that he will "commit criminal acts of violence that will constitute a continuing threat to society." Former Article 37.071(b)(2), supra. In addressing both contentions, we will determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements ... beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) (emphasis in the original).

### A. The Verdict

Appellant does not contend that the evidence was insufficient to show beyond a reasonable doubt that he murdered Kunkel. Instead, he argues that the evidence was insufficient to support the kidnapping allegation that elevated the offense to capital murder.

Appellant directs our attention to *Guerra v. State*, 690 S.W.2d 901 (Tex.App.—San Antonio 1985, no pet.), in which a court of appeals found the evidence sufficient to show capital murder committed during the course of kidnapping or attempted kidnapping. He argues that the *Guerra* court based its affirmance on the fact that "the victim was re-

---

5. The State did not dwell on the facts of appellant's forgery conviction, but they were explained by appellant's father as a witness for the defense:

Appellant forged his parents' signatures on checks drawn on their bank accounts in order to raise money to feed his drug habit.

moved by force and deadly force was used to keep her in the vehicle." He contends that his case is distinguishable from *Guerra* in that "there is no evidence that the victim was removed under the use or threat of any force, or that she was held or secreted by Appellant." Appellant's argument assumes that secretion and the use or threatened use of deadly force are part of the *actus reus* of kidnapping. To the contrary, however, as the discussion *post* will demonstrate, they are more correctly construed as components of the *mens rea* requirement.

Chapter 20 of the Penal Code defines and proscribes the interrelated offenses of "false imprisonment," "kidnapping" and "aggravated kidnapping." "False imprisonment" is the intentional restraint of a person, which is defined as the "restrict[ion of] a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him." V.T.C.A. Penal Code, § 20.01(1). Kidnapping is the intentional or knowing "abduction" of a person. "Abduct" is defined as:

"restrain[t of] a person with intent to prevent his liberation by:

(A) secreting or holding him in a place where he is not likely to be found; or

(B) using or threatening to use deadly force."

A problem of statutory construction lurks in the definition of "abduct," *viz:* Do subcategories (A) and (B) modify "restraint" or "intent to prevent liberation?" In other words, are secretion and deadly force subsets of the act element of "restraint," or do they modify the *mens rea* element of "intent to prevent liberation"? If it is the former, a kidnapping becomes a completed offense when a restraint with intent to prevent liberation is accomplished by either secretion or the use or threatened use of deadly force. If it is the

latter, then a kidnapping becomes a completed offense when a restraint is accomplished, and there is evidence that the actor intended to prevent liberation and that he intended to do so by either secretion or the use or threatened use of deadly force.

We believe the latter construction to be correct. It is true that previous opinions by this Court have contained language indicating that the secretion/deadly force components of "abduct" encompass an act requirement. See *Boyle v. State,* 820 S.W.2d 122, 138 (Tex.Cr.App.1989); *Huddleston v. State,* 661 S.W.2d 111, 112–13 (Tex.Cr.App.1983). However, the Court in those cases was not directly addressing this question. Construing secretion/deadly force as an act requirement, rather than as a component of the specific intent to prevent liberation, ignores the plain fact that the specific intent requirement of the kidnapping statute is what distinguishes it from false imprisonment. False imprisonment is nothing more than an intentional restraint as that term is statutorily defined. A false imprisonment becomes a kidnapping when an actor evidences a specific intent to prevent liberation by either secretion or deadly force. To hold, instead, that false imprisonment is elevated to kidnapping by the manner in which a restraint is accomplished is to ignore the plainly punctuated, unadorned text of the statute. See V.T.C.A. Penal Code, § 20.01 *et seq.*[6]

Thus construed, the definitions in Chapter 20 of the Penal Code, when taken together, provide that kidnapping is the intentional or knowing restriction of a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him, with intent to prevent his liberation by secreting him or holding him in a place where he is not likely to be found or by using or threatening to use deadly force. Put more simply: The State had the burden of proving

---

6. The Penal Code provides, "'Abduct' means to restrain a person with intent to prevent liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* So punctuated, the phrase beginning with "by" clearly modifies "intent to prevent liberation." Had the Legislature meant for "by" to modify

"restrain," then it would have set off the intervening phrase with commas, *viz:* "'Abduct' means to restrain a person, with intent to prevent liberation, by...." Cf. V.T.C.A. Government Code § 311.011 ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage.")

1) a restraint made 2) with a specific intent to prevent liberation by either of two particular means. Thus, secretion and the use or threatened use of deadly force are merely two alternative components of the specific intent element. It is therefore not necessary, as appellant argues, that the State prove a restraint accomplished by either secretion or deadly force. Instead, the State must prove that a restraint was completed and that the actor evidenced a specific intent to prevent liberation by either secretion or deadly force.

The State's evidence in this cause meets that burden. The restraint is apparent from the face of appellant's written confession. It began when appellant dragged Kunkel down the hall of his home; it ended only with her death. It cannot be gainsaid that appellant restricted Kunkel's movements in an escalating course of force and intimidation "so as to interfere substantially with her liberty" by effectively "confining" her without her consent until he took her life.[7] See and compare *Earhart v. State*, 823 S.W.2d 607, 618 (Tex. Cr.App.1991); *Boyle*, supra, at 138; *Rogers v. State*, 687 S.W.2d 337, 342 (Tex.Cr.App. 1985); *Sanders v. State*, 605 S.W.2d 612, 614 (Tex.Cr.App.1980); see also *Rodriguez v. State*, 646 S.W.2d 524, 526 (Tex.App.—Houston [1st Dist.] 1982, no pet.)

The underlying "false imprisonment" having been established, the remaining issue is whether appellant harbored the specific intent to prevent liberation required by § 20.01(2).[8] As noted *ante*, to support a kidnapping allegation, the State must prove an intent to prevent liberation by one of two statutory means: secretion or deadly force. In this cause, a rational jury could infer that appellant intended the former. The facts adduced at trial in support of this inference include the following: 1) appellant's efforts to shield the master bedroom of his home from outside view by placing a heavy blanket over a window already screened by both drapes and blinds; 2) appellant's misidentification of himself to Kunkel's mother and his instruction to Kunkel to lie about where she was going; 3) appellant's act of injecting his victim with cocaine in the express belief that this would "calm" her; 4) and the sexual nature of the assault.

From these evidentiary facts the jury could have inferred an intent by appellant to abduct and, during the course of the abduction, repeatedly sexually assault Kunkel.[9] That is, a jury could have inferred that appellant intended to lure Kunkel to his home by deceit, subdue and restrain her by force, and conceal her in a bedroom of his home to prevent her liberation for the purpose of repeatedly assaulting her sexually. It is not necessary that this Court find to its own satisfaction that such was appellant's intent. It is enough for us to find that "any" rational jury could have so found beyond a reasonable doubt. Given the evidence adduced at trial, we cannot say this jury's verdict was irrational. *Jackson v. Virginia*, supra. We hold

7. Indeed, appellant comes close to conceding the restraint element of kidnapping in his briefs: "At best, the State's evidence shows that the victim was 'restrained.'" Brief for Appellant at 21.

8. In *Jackson*, supra, the United States Supreme Court was faced with a question virtually identical to the one before us: whether the evidence was sufficient to support a verdict of guilty for an offense requiring a specific intent. *Jackson*, 443 U.S. at 309, 99 S.Ct. at 2784, 61 L.Ed.2d at 567. The Supreme Court in that case found the evidence sufficient.

9. Admittedly, the above-listed evidentiary facts also are consistent with a plan by appellant to sexually assault and then kill Kunkel, without ever intending to abduct her. The evidence of either intent is, of course, entirely circumstantial.

But so was the evidence of intent to kill in *Jackson*, supra. The Supreme Court wrote in *Jackson*:

"Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt could this petitioner's challenge be sustained. That theory the Court has rejected in the past."

*Jackson*, 443 U.S. at 326, 99 S.Ct. at 2792–93, 61 L.Ed.2d at 578.

This Court has rejected that theory as well. *Geesa v. State*, 820 S.W.2d 154 (Tex.Cr.App. 1991). And while this is a pre-*Geesa* case, the Court has held that the pre-*Geesa* "reasonable outstanding hypothesis" analytical construct is, and always was, inapplicable to the *mens rea* element of an offense. *Matson v. State*, 819 S.W.2d 839, 845–46 (Tex.Cr.App.1991).

the evidence was sufficient to support a verdict of guilty to the charge of capital murder.[10]

### B. The Sentence

We bring the same standard of review to bear on appellant's claim that the evidence is insufficient to support an affirmative finding of future dangerousness, *viz:* After viewing all the evidence in the light most favorable to the verdict, we ask whether any rational factfinder could have answered the second special issue affirmatively beyond a reasonable doubt. *Cantu v. State,* 842 S.W.2d 667, 674 (Tex.Cr.App.1992); *Huffman v. State,* 746 S.W.2d 212, 224 (Tex.Cr.App.1988). Appellant finds the facts of his case "remarkably like those of *Huffman,*" supra, and contends that the "evidence here is likewise insufficient to support that [affirmative] finding." The State, without citation to supporting case law, contends that "[t]here is ample evidence in this record to support the jury's verdict."

We agree with the State. This offense rises above the level we were concerned with in *Huffman,* supra. This was not a spur-of-the-moment offense, but one that a jury could have found to be both "calculated" and "cold-blooded." *Huffman,* 746 S.W.2d at 223 (quoting *Roney v. State,* 632 S.W.2d 598 (Tex.Cr.App.1982). Appellant lured Kunkel to his home by deception. The jury implicitly found that he intended to kidnap her. The sexual nature of the ensuing assault is obvious. Not content with simple strangulation, appellant made sure of Kunkel's demise by tying a ligature around her neck and forcing a sock down her throat. He admitted to stripping the clothes from his victim so that he could "admire" her naked, lifeless body. In sum, his actions evidence a depravity that goes beyond that of "every murder" committed during the course of an attempted kidnapping. *Id.*

Nor is the record devoid of evidence of future dangerousness outside the facts of the offense. While a non-violent criminal record, by itself, is not sufficient under *Huffman* to support a finding of future dangerousness, it is evidence presaging a character trait of lawlessness, which in turn is a component of future dangerousness. In addition to the appellant's extended criminal record, there also was evidence that his assault on Kunkel was by no means an isolated incident. One woman testified that appellant had assaulted her two weeks prior to the instant offense, under circumstances similar to the instant offense. Two other women gave testimony by which a jury could reasonably infer that appellant had a similar design subsequent to the instant offense. During jury argument in the punishment phase of the trial, the State characterized these incidents as appellant's failed attempts at victimizing these women as he had Kunkel. On appeal, the State argues that these three failed attempts, coupled with the brutal murder of Kunkel, provided a basis for a rational jury to conclude that appellant would be a continuing threat to society. We agree. We hold that the evidence is at least minimally sufficient under *Jackson,* supra, to support the jury's affirmative finding of future dangerousness. See *Cantu,* supra; *Burns v. State,* 761 S.W.2d 353 (Tex.Cr.App.1988).

### III. The Search

In his second point of error, appellant contends that the trial court erred in failing to grant his motion to suppress evidence. He argues that the warrantless search of his residence violated the Fourth Amendment.[11] Therefore, he contends, the evidence obtained in that search was improperly used against him at trial in violation of Article 38.23, V.A.C.C.P.

---

10. Noting that "[k]idnapping is a crime with deep roots in the common law[,]" Judge Miller argues that evidence of a kidnapping was lacking in this cause. 918 S.W.2d 466, 485. We might be inclined to agree, were we construing the common law offense of kidnapping. Instead, we construe the *statutory* offense of kidnapping. That *statute* propels our analysis.

11. Appellant also argues the search of his home violated Article I, § 9 of the Texas Constitution, but makes no separate argument to that effect. Absent any argument or authority that Article I, § 9 provides more protection than the Fourth Amendment or any reason why this Court should interpret our constitution differently from the federal constitution, it has been the practice of this Court to "decline to pursue appellant's Texas Constitutional arguments for him." *Johnson v. State,* 853 S.W.2d 527, 533 (Tex.Cr.App.1992).

The lack of a search warrant for the Brimage residence was revealed during a pretrial hearing on the appellant's discovery motion:

"[Appellant's Counsel]: Your honor ... we have done some investigation and we haven't been able to find a search warrant as to the residence on Richard Street. We would ask that the State specifically produce a—a search warrant in that respect, if they have one.

[Prosecutor]: There is no search warrant.

[Counsel]: There—There is no search warrant?

[Prosecutor]: No.

[Counsel]: Then how did you get in the house?

[Prosecutor]: Max Bennett.

[The Court]: What was that?

[Prosecutor]: The manner of entry was of consent.

[Counsel]: Is that what you're going to rely on?

[Prosecutor]: For entering the house, yes, sir."

Later, at a hearing on the appellant's motion to suppress, Captain Gomez and Judge Bennett gave essentially identical testimony about the events immediately preceding the warrantless search of the Brimage residence. Gomez testified that Bennett and Turcotte met him at the police station, informed him that they had "broken in to the Brimage residence," and that there was "evidence of a violent act in the back bedroom." Gomez said that he then asked Bennett for permission to search the house, and that Bennett replied, "Yes, you need to get in there." Bennett also characterized his entry into the Brimage residence as a "break in." He testified that, after the break-in, and after discovering the house in disarray, he met with Gomez at the police station and said, "Mr. Gomez, we're here on a matter to bring something to your attention. I have just broken into the Brimage house. There has been a disturbance there, and I think you ought to go over there."

Gomez testified that he did not ask Bennett whether he had authority to consent to a search of the Brimage residence, nor did he ask Bennett to sign a consent-to-search form. Bennett testified that he did not have permission to enter the house himself, much less grant consent for a police search.[12] He admitted that the Brimages "probably would have objected" to his breaking into the house, but that he "would have gone into the house whether they objected or not." Neither Gomez nor Bennett characterized the police search of the Brimage home as a response to an "emergency" situation. Gomez testified that he merely "assumed that he had every right to tell me as a elder, or whatever, I assumed he was the elder brother of the family, or whatever, to give me the right to go into that house." [13]

---

12. Bennett lives in Corpus Christi, not Kingsville. While he described his relationship with the Brimages as "close," he testified that he had never spent the night in the Brimage home nor owned any interest in the residence. On the issue of authority to consent to a search of the house, Bennett testified as follows:

"Q: Did the—Did you receive any kind of authority, any kind whatsoever from your sister or your brother-in-law (appellant's parents) authorizing you to allow police to enter that home on October 7th, 1987?
A: No, sir.
Q: Did the police ever ask you if you had authority to allow them in the home?
A: No.
Q: Was that word ever used?
A: No.
Q: Did they ask you if they needed to get a warrant?
A: No, sir.
Q: Was the word warrant ever used?
A: No, sir."

13. There were two separate hearings on appellant's motion to suppress. Gomez and Bennett testified at both hearings.

At one point in the first hearing, Gomez describes his search as "evidentiary" in nature. Elsewhere in that hearing, he claims to have been looking for the then-missing, and presumably alive, victim. However, Gomez initially makes no mention of any sense of urgency or of an emergency situation requiring the immediate search of the Brimage home. Instead, he describes an almost-casual decision to search the home based solely on Bennett's consent. Indeed, following the granting of that permission, the search was delayed for as much as 30 minutes while Gomez and Bennett discussed the "conditions" Bennett had placed on the search, primarily the number of officers to be involved.

At the second hearing, four days later, Gomez was asked by the prosecuting attorney whether

Both Gomez and Bennett testified that they did not discuss securing a search warrant for the Brimage residence prior to the search of the house by the police. When asked whether he, as a district judge, was "concerned about entering a house on a search for evidence in a criminal case without a search warrant," Bennett replied that he was not, explaining, "I was prepared to accept the consequences of doing something I thought was necessary.... I was not concerned about those legal aspects at all. I was not functioning as a lawyer or as a judge."

The consequences of an illegal, warrantless search include the suppression of the evidence obtained in that search. See e.g., *Mapp v. Ohio*, 367 U.S. 643, 653–55, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1088–90 (1961) (applying the federal exclusionary rule to the states through the Fourteenth Amendment); *Odenthal v. State*, 106 Tex.Crim. 1, 290 S.W. 743, 750 (1927) (state statute [now Article 38.23, *supra*] requires the exclusion of evidence obtained in warrantless search without probable cause); see generally Robert R. Barton, Texas Search and Seizure § 2.015 (1992). Appellant asked the trial court to suppress the evidence obtained in the warrantless search of his residence, but that motion was denied. The trial court's exact reasoning in denying the motion is less than crystal clear.[14] The trial court's reasoning is irrelevant, however, so long as *any* theory articulated by the State supports the legality of the search. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Cr.App.1990). Furthermore, we will uphold the trial court's ruling on the admission or exclusion of evidence unless the record clearly shows that the court abused its discretion. See *Maddox v. State*, 682 S.W.2d 563, 564 (Tex.Cr.App.1985); *Green v. State*, 615 S.W.2d 700, 707 (Tex.Cr.App.1980).

The State offers three reasons the trial court did not err in failing to suppress the evidence obtained from the Brimage resi-

---

"there was any urgency or emergency concerning your entry into the house on 1135 West Richard?" Gomez replied:

"Well, sir, I could tell when he (Bennett) walked in that he was distraught. And once he told me that there—that he had gotten into the house and had seen certain items in the house that match what I had showed in this—the suitcase that I recovered just moments earlier, I could sense from his tone of voice the way he said, 'I'—'you need to get in there.' I sensed that there was an extreme urgency to get in the house. I had no idea what was in that house. I hadn't anticipated what was in the house and he said, 'You need to get in there.' And there was an extreme sense of urgency in his voice conveyed to me, sir."

Later, under cross-examination by defense counsel:

"Q: [C]orrect me if I am wrong, your wording was that you ... did not anticipate what was ultimately found at that house?

A: That's correct.

Q: So you weren't anticipating finding a body or anyone in the house, were you?

A: No, I didn't know what—I didn't know what his urgency was, sir. I didn't know if there was—I didn't know if he had just seen what he had seen in the bedroom and I had no idea what happened. He just said, 'You need to get in.'

Q: But you are not telling this Court that it was an emergency situation where someone was injured over there and you had to get over there to help them, right?

A: I did not know that at the time, no, sir."

14. The State's initial theory in support of the legality of the search was that appellant had somehow "abandoned" his home. The trial court rejected that argument, specifically finding appellant had standing to challenge the search, and the State does not contest this ruling on appeal.

The trial court then concluded that the Fourth Amendment does not require the exclusion of incriminating evidence illegally obtained through a search by private citizens—an allusion, we presume, to the break-in by Bennett and Turcotte. That is a correct recitation of the *federal* exclusionary rule. E.g., *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); *Stoker v. State*, 788 S.W.2d 1 (Tex.Cr. App.1989). However, such a conclusion concerning our *statutory* exclusionary rule is by no means certain. See Article 38.23(a), V.A.C.C.P. ("No evidence obtained by an officer *or other person* in violation [of law] shall be admitted.") (emphasis added); see *Gillett v. State*, 588 S.W.2d 361, 367–71 (Tex.Cr.App.1979) (Roberts, J., dissenting) (Article 38.23 applies to "officers or other persons alike"). In any event, this issue has no bearing on this case in that it does not justify the police officers' later entry and search of appellant's residence.

Finally, the trial court mentioned both the "apparent authority" doctrine and "Bennett's sounding of urgency" in denying the motion to suppress. While these two concepts are distinct, they are not mutually exclusive, and the court seems to have relied on both in justifying the search.

dence. First, the State argues that the search was valid as a "consent" search. Failing that, the State urges in the alternative that the search was justified under the "emergency doctrine." And in any event, the State maintains, the evidence recovered in the search would have been inevitably discovered, and therefore should not be suppressed. We will address each of these arguments in turn.

### A. Consent

The State correctly notes that consent searches are an established exception to the warrant and probable cause requirements of the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). When the State has secured the voluntary consent to a warrantless search, such a search violates neither the United States or Texas constitutions, nor the laws of this state. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Becknell v. State*, 720 S.W.2d 526 (Tex.Cr.App.1986); *Sharp v. State*, 707 S.W.2d 611 (Tex.Cr.App.1986).

The record is clear that, in the instant case, the police did not have a warrant authorizing the search of appellant's home. It is also clear that the police did obtain consent to search the home and that that consent was given by Judge Bennett. The issue thus becomes whether Bennett had the authority to consent to the search of appellant's home. *Matlock*, 415 U.S. at 171, 94 S.Ct. at 993, 39 L.Ed.2d at 250. The State argues that Bennett possessed "common authority" over the Brimage's house because he "had a relationship with the premises sufficient under the circumstances to give him capacity to give consent." The record developed at the pretrial suppression hearings belies this assertion.

In order for a person other than the owner to validly consent to the search of property, that person must have "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* The Supreme Court has defined "common authority" as the "mutual use of the property by persons generally having joint access or control for most purposes." *Id.*, at

n. 7. This Court, likewise, has declared that, in order for a person to validly consent to a search, that person must have equal control and equal use of the premises searched. *Becknell*, supra, at 528; *Sharp*, supra, at 617. Thus, in order for Bennett to validly consent to the officers' search, the State must establish he had joint and equal access to or control over the Brimage home.

Bennett testified that he did not have any financial interest in the Brimage's house, that he did not keep any personal property there, and that he had never spent the night there. Appellant's father, the owner of the residence, testified that Bennett had neither control over nor access to the home. He further testified that, at the time of the search in question, while he and his wife were away on vacation, appellant was the only person with a key to the house and the only person who was permitted to use the house. On these undisputed facts, it certainly cannot be said that Bennett possessed any sort of "common authority" over the property. Consequently, Bennett did not have actual authority to consent to the search of the Brimage's home.

Absent any actual authority to consent to the search, the State next argues that it should be sustained because the officers "relied in good faith" on Bennett's consent to search the house and the circumstances reasonably indicated that he did in fact have authority to consent to such a search. In other words, the warrantless search of appellant's home was justified because the searching officers relied on Bennett's "apparent authority" to consent to such a search.

The so-called "apparent authority" doctrine was adopted by the United States Supreme Court in *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). In *Rodriguez*, the defendant was arrested in his apartment and charged with possession of controlled substances. *Id.*, at 179, 110 S.Ct. at 2796, 111 L.Ed.2d at 155. The arresting officers did not have an arrest or search warrant, but entered the defendant's home with the consent of his former girlfriend. *Id.*, at 180, 110 S.Ct. at 2797, 111 L.Ed.2d at 156. The girlfriend referred to the apartment as "ours," told officers that she had clothes and other possessions inside,

opened the door with a key, and gave consent to search. *Id.* In actuality, she no longer lived in the apartment, was not paying rent or authorized to have a key, and was not to enter the apartment unless the defendant was present. *Id.*

In evaluating whether the officers were justified in relying on the girlfriend's apparent authority to consent to such a search, the Supreme Court concluded that "[w]hether the basis for such [apparent] authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably." *Id.,* at 186, 110 S.Ct. at 2800, 111 L.Ed.2d at 160. Thus, a warrantless search pursuant to a third party consent is valid if "the facts available to the officer at the moment [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Id.,* at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161 (internal quotation omitted).

In reaching its holding, the Supreme Court cautioned that it should not be understood as suggesting that police officers may always accept any person's invitation to enter a residence.

"Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an

objective standard: would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises. If not, then warrantless entry without further inquiry is unlawful unless authority actually exists."

*Id.* (internal quotation and citation omitted).

The closest this Court has come to adopting the apparent authority doctrine was in *McNairy v. State,* 835 S.W.2d 101 (Tex.Cr. App.1991). Without formally adopting the doctrine, we found it to be of some value in the resolution of the issues presented.[15] In passing, we noted that the apparent authority doctrine was helpful in determining whether the officers were justified "in being where they were" when probable cause to conduct a warrantless search arose. *McNairy,* supra, at 105. Nevertheless, we opined that should "ambiguous circumstances" arise which cast doubt on the effectiveness of the consent or the extent of the consent given, the officers "must stop and make inquiries as to the continued effectiveness of the consent." *Id.,* citing *Rodriguez,* supra.

In the instant case, in order for the warrantless search of appellant's house to be justified under the apparent authority doctrine, the facts must show that the searching officers acted reasonably in relying on Bennett's apparent authority to consent to its search. This was not the case. The circumstances surrounding Bennett's alleged consent were such that no person could reasonably believe that he had the authority to give

---

**15.** Briefly, McNairy was convicted of possessing controlled substances seized from his mobile trailer house. Officers were originally called to a disturbance at the property and found a quantity of drugs and drug paraphernalia. At this point, the officers obtained voluntary written consent from the property owner to search her house and all outbuildings on her ten-acre tract of land. The officers then discovered a methamphetamine lab in the main house. This prompted the officers to further search the area surrounding the house. Some distance behind the house, the officers happened upon a mobile trailer house. As the officers approached, they smelled the strong odor of methamphetamine emanating from the trailer. They also heard people rushing from the trailer into the nearby brush. A single

officer opened the back door of the trailer to see if anyone was inside. As he did so, he noticed chemicals stacked inside the trailer which he knew were often used in manufacturing methamphetamine. Only then did the officer question the owner of the property and learn for the first time that the trailer, itself, was rented to McNairy.

The Court of Appeals applied the apparent authority doctrine to uphold the officer's initial search of McNairy's home. We held that to be error but ultimately upheld the officer's search on the grounds that at the time the officer entered the trailer probable cause existed for the search and the officer acted reasonably because he was faced with a real possibility that evidence would be destroyed. *Id.,* at 107.

the consent necessary for the police to enter and search the Brimage home. At the time of the consent, the police officers were fully aware that neither Bennett nor Turcotte lived at 1135 West Richard. The officers knew that they did not have a key to the house and that they had, in fact, broken into it. Furthermore, the officers knew that Turcotte had earlier stated that he did not have any authority to allow the police to search the house. These facts alone are sufficient to raise "ambiguous circumstances" which should have alerted the police to the possibility that neither Bennett nor Turcotte could authorize the search of the property. At a minimum, the police should have inquired further into the alleged basis for Bennett's authority. *Rodriguez & McNairy,* both supra. But as Gomez and a second officer admitted at the pre-trial hearing, no one ever questioned Bennett about his authority, or lack thereof. On these facts, it cannot be said that the police officers acted reasonably in relying on Bennett's alleged consent as their authority to dispense with getting a search warrant in order to enter and search appellant's home.

### B. Exigent Circumstances

The State also argues that the warrantless search of appellant's home was an "emergency search" justified by the police officers' belief "that the missing girl might be in the house and that she might be injured and in need of assistance to save her life." Appellant argues that the facts developed at the pre-trial hearing clearly show that "this was not a situation where immediate entry [of appellant's residence] was necessary because [the officers reasonably believed] a person was in need of immediate aid or medical assistance." To the contrary, appellant asserts, "it was obvious [to the officers] that no one was home." We agree.

It is generally accepted that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, 300 (1978); *Janicek v. State,* 634 S.W.2d 687 (Tex.Cr.App.1982);

*Bray v. State,* 597 S.W.2d 763 (Tex.Cr.App. 1980). This exception is commonly referred to as the emergency doctrine. *Bray,* 597 S.W.2d at 764.

This so-called emergency doctrine is nothing more than a specific application of the exigent circumstances exception to the Fourth Amendment's warrant requirement. Whether the circumstances surrounding the officers' warrantless entry and search be characterized as exigent or that of an emergency, both may serve to exempt the officers' actions from the warrant requirement of the Fourth Amendment. Under the emergency doctrine, the exigency which may render the warrantless entry and search reasonable is the officers' "need to act immediately to protect or preserve life or to prevent serious injury." *Id.*

As is true of every warrantless search of a residence, the burden of proof is on the State to justify the search. In order to justify the search of a residence under the emergency doctrine, the State must show 1) that the officers had probable cause to search the residence, and 2) that obtaining a search warrant was impracticable because the officers reasonably believed there was an immediate need to act in order to protect or preserve life or to prevent serious bodily injury. *Id.; Brown v. State,* 481 S.W.2d 106 (Tex.Cr.App.1972). This is not to say that the State must prove an actual emergency existed at the time of the officer's warrantless entry. The State need only show that the facts and circumstances surrounding the entry and search were such that the officers reasonably believed that an emergency existed which made obtaining a search warrant impracticable. *Id.* Courts must use an objective standard of reasonableness in assessing the officers' belief that such an emergency actually existed. *Bray,* 597 S.W.2d at 765; *Janicek,* 634 S.W.2d at 691.

The State argues that the warrantless search of appellant's home is justified because the police believed that the missing girl might be in the house and that she might be injured or in need of assistance. The facts developed at the pre-trial hearing, however, do not bear this out. Quite to the contrary, the police characterized the search as "evi-

dentiary" in nature. The decision to search the residence was arrived at almost casually, based entirely on the "consent" granted by Bennett. The police were not expecting to find a body at the house, much less an alive and injured victim in need of assistance. See n. 13, *ante.* We therefore reject the State's argument.[16]

16. In his dissent Judge Campbell argues that this Court should hold the search valid under the emergency doctrine. We disagree, and we pause here to explain why.

First, the dissent argues that "the emergency doctrine may justify entry into a dwelling to seek a person who has been reported missing" or "to discover evidence or a 'lead' which could reveal the location of the missing person elsewhere." Op. at 492, citing *People v. Wharton*, 53 Cal.3d 522, 280 Cal.Rptr. 631, 665, 809 P.2d 290, 324 (1991) and *Chaney v. State*, 612 P.2d 269, 277 (Okla.Crim.App.1980), respectively. In response, we would point out that *Wharton* is inapplicable to this cause in that it holds, as do the cases it cites, that a warrantless entry into the *victim's* dwelling in a missing person investigation may be validated by the emergency doctrine. See *Wharton*, supra, 809 P.2d at 324; see also Wayne R. LaFave, Search and Seizure § 6.6(a), at 702 (2d ed. 1987) (emergency doctrine allows police "to seek an *occupant* reliably reported as missing") (emphasis added). As for *Chaney*, that case merely stands for the proposition that the emergency doctrine encompasses searches for evidence that would lead to a kidnap victim as well as searches for the victim himself. *Chaney*, supra, at 277. It in no way changes the core requirement of the emergency doctrine, *viz:* that police must reasonably believe there is an immediate need to protect or preserve life.

Next, the dissent points to ten facts known to the officers that "would warrant a reasonable officer to believe that an emergency existed." Op. at 492. Those facts, however, show nothing more than probable cause to believe that a crime had been committed and that appellant was connected to its commission. See, e.g., *id.* ("the victim had been missing for over two days"); *id.* ("the victim was last seen on the morning of her disappearance in the neighborhood of appellant's home"). There was ample probable cause for police to search appellant's home. Probable cause is not the issue. The issue, as it is in most "emergency" situations, is whether police were justified in not seeking judicial determination of probable cause through application for a search warrant. The only "objective" fact cited by the dissent to support the existence of an emergency is the officers' awareness of an " 'extreme urgency' on the part of the Judge Bennett for them to enter appellant's home." Op. at 493. We are at a loss to see how an officer's subjective interpre-

### C. Inevitable Discovery

Having determined that the officers' warrantless search of appellant's home is insupportable under either a theory of third party consent or the emergency doctrine, it follows that the search was unlawful and any evidence seized as a direct result of the search must be excluded. *Weeks v. United States,*

tation of a witness's subjective state of mind is in any way "objective."

The dissent then chides us for "not completely understand[ing] the difference between an objective and subjective inquiry." Op. at 493 n. 1. The dissent does so because we note that the officers themselves were under no delusion that their search was in response to an emergency. This, the dissent contends, "fails to give effect to our prior case law, which clearly mandates an inquiry based on *objective* reasonableness." Op. at 493, citing *Janicek*, supra. In doing so, the dissent ignores that *Janicek*, as well as every other case we can find on the subject, premises the emergency doctrine on the idea that an officer reasonably believed that an emergency existed. The objective inquiry required by *Janicek et al* is into the reasonableness of the officer's belief. For an officer's belief to be reasonable, the officer first must have that belief. An objective inquiry is required because we will not condone a warrantless search based on an officer's belief that an emergency existed when that belief is unreasonable given the objective facts and circumstances known to the officer. Here, there was no such belief at all. See note 13, supra.

Finally, the dissent isolates one passage from a two-day pre-trial hearing to support its contention that police did harbor the subjective belief that an emergency existed. We have two responses to this argument: First, in relying on that isolated comment, the dissent distorts the record by failing to consider it "as a whole," as we are required to do. Only one conclusion can be drawn from the entire record, and that is that the officers were not reacting to a perceived emergency. See note 13, supra. Second, even if the police had believed that an emergency existed, that belief would have been objectively unreasonable given the complete and utter lack of evidence that there was an immediate need to protect or preserve life.

Although Judge Campbell offers Professor LaFave's treatise as support for his dissent, he fails to note that the very section he cites posits that an emergency search "must not be primarily motivated by intent to arrest and seize evidence" and that "it is essential that courts be alert to the possibility of subterfuge, that is, a false claim of such a purpose where the true intent is to seek evidence of criminal conduct." LaFave, supra, § 6.6(a), at 706. Here, given the record as a whole, it is clear that police made no such false claim. Of course, they do not need to; the dissent is willing to make that claim for them.

232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Article 38.23, supra. Nevertheless, the State cites *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), and urges this Court to adopt the inevitable discovery doctrine.

In *Nix,* the Supreme Court crafted an exception to the federal exclusionary rule, one which allows the admission of evidence obtained through an illegal search when the State shows by a preponderance of the evidence that the evidence inevitably would have been discovered by lawful means. *Id.* The State contends such was the case below, in that either appellant's parents or passersby would have eventually discovered the victim's body. That contention, however, rests upon unsubstantiated assumptions which the State did not raise before the trial court, and which, consequently, the appellant did not attempt to rebut.

Even had this issue been developed below, however, its resolution would be irrelevant to our discussion today. At trial and on appeal appellant has asked that the evidence seized pursuant to the illegal search of his home be excluded under Article 38.23, supra. This Court recently held that federal inevitable discovery doctrine is inapplicable to Article 38.23. *Garcia v. State,* 829 S.W.2d 796, 800 (Tex.Cr.App.1992) (plurality opinion). We see no reason to revisit that holding here.

### D. Harm Analysis

Having found error in the admission of the evidence taken in an unlawful search, our rules require that we "reverse the judgment under review, unless [we] determine . . . beyond a reasonable doubt that the error made no contribution to the conviction or punishment." Tex.R.App.Pro., Rule 81(b)(2); see also *Harris v. State,* 790 S.W.2d 568 (Tex.Cr. App.1989). Rule 81(b)(2) requires that we ask "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Harris,* supra, at 585, *quoting, Fahy v. Connecticut,* 375 U.S. 85, 88, 84 S.Ct. 229, 231, 11 L.Ed.2d 171 (1963). Here, the evidence complained of includes, *inter alia,* the body of the victim, as well as photographs, fingerprints, clothing, and hair and blood samples the police gathered in their investigation of the crime scene. We cannot say beyond a reasonable doubt that this evidence did not contribute to the conviction.

### IV.

Having found that the search of appellant's home was illegal, and that evidence obtained in that search was admitted against him at trial in violation of Article 38.23, supra, and that the error in admitting the evidence was not harmless beyond a reasonable doubt, we reverse appellant's conviction and remand the cause to the trial court.

MILLER, Judge, concurring and dissenting.

I agree that the search and seizure conducted by the police at Appellant's home violated his constitutional rights. However, the plurality further holds that the evidence was sufficient to support Appellant's capital murder conviction based on kidnapping, under their interpretation of § 20.03 of the Texas Penal Code. Because I cannot agree with the plurality's construction of the Texas kidnapping statute, I am compelled to dissent.

### I.

Based upon a convoluted and strained reading of Penal Code § 20.03, the plurality holds that no significant degree of movement is required to support the offense of kidnapping. They conclude that a kidnapping occurs "when a restraint is accomplished, and there is evidence that the actor intended to prevent the victim's liberation and that he intended to do so by either secretion or use or threatened use of deadly force." *Plurality Opinion* at 475. Such a reading is contrary to the historical development of kidnapping law in Texas and the United States generally. Worse, this interpretation would turn virtually any assault into a kidnapping.

To support a finding of kidnapping or attempted kidnapping, two key elements must be present: restraint and movement. After a careful review of general Texas kidnapping cases, as well as the case law of some of our sister states, it is apparent that two diametri-

cally opposed, prevailing views exist on the movement element. One view is that a slight movement is a sufficient basis to find kidnapping, and the other view is, of course, that kidnapping requires a substantial movement.

## A. Texas Statutory Development

Kidnapping is a crime with deep roots in the common law. *See* 4 WILLIAM BLACKSTONE, COMMENTARIES 219. In England, kidnapping once required that the victim be removed from the country in order to constitute the crime, and the violation was punished as a misdemeanor. *Id.* Adult men, generally, could not be kidnapped. *Id.* Eventually, removal from the country was no longer required, but a substantial movement was. Francis Wharton, WHARTON'S CRIMINAL LAW § 210 (C.E. Torica ed., 14th ed. 1979 & Supp.1992).

The United States adopted the British definition and gradually altered it until the law required only that the victim be moved across state lines. *Id.* Over time, however, the distance of movement necessary to satisfy the definition of kidnapping shrunk until most states defined the crime without reference to interstate transport. *Id.*

According to the former law in Texas, a child 17 or under could be kidnapped if concealed from or taken from his parents, but an adult could only be kidnapped if the motive was to remove that person from the State. TEX.PENAL CODE ANN. art. 1177 (repealed 1974). Furthermore, the term "abduction" was reserved only for those instances where one falsely imprisoned a woman with intent

to "force her into a marriage or for the purpose of prostitution." *Id.* art. 1179.

Our current Penal Code modified the earlier requirements and § 20.03 now defines the act of kidnapping as intentionally or knowingly abducting another person. TEX.PENAL CODE ANN. § 20.03 (Vernon supp. 1988). Abduction is defined as "[restraining] a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2). "Restrain" is in turn defined as "[restricting] a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him." *Id.* § 20.01(1).

## B. Texas Kidnapping Cases

Texas law does not impose a minimal requirement for restraint other than the fact that the interference with the person's liberty must be substantial. *Earhart v. State*, 823 S.W.2d 607, 618 (Tex.Crim.App.1991) (citing *Rogers v. State*, 687 S.W.2d 337 (Tex.Crim. App.1985)). Neither does it require that the interference be for a minimum length of time. *Rogers*, 687 S.W.2d at 342 (citing *Rodriguez v. State*, 646 S.W.2d 524 (Tex.App.— Houston [1st Dist.] 1982, no pet.)). Nevertheless, an examination of past cases reveals that most contain an interference that is more substantial than that found in the present case.[1]

In *Earhart*, the appellant was convicted on the basis of circumstantial evidence after a young girl was abducted and murdered. 823 S.W.2d at 611–618. The definition of re-

---

1. Both *Earhart* and *Gribble v. State*, 808 S.W.2d 65 (Tex.Crim.App.1990) are representative of what Texas usually views as kidnapping; that is, some movement or restraint must occur. Other similar cases include *Boyle v. State*, 820 S.W.2d 122 (Tex.Crim.App.1989), *cert. denied*, 503 U.S. 921, 112 S.Ct. 1297, 117 L.Ed.2d 520 (1992) (girl solicited a ride in a semi-tractor and was later found in a culvert outside town dead, bound and gagged); *Webb v. State*, 760 S.W.2d 263 (Tex. Crim.App.1988), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989) (victims were abducted in a robbery attempt and forced to drive around town until they were shot and killed); *Lincecum v. State*, 736 S.W.2d 673, 679– 680 (Tex.Crim.App.1987), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 936 (1988)

(mother and son were abducted in their car from church parking lot, were heard screaming for assistance, and never returned); *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Crim.App.1981) (opinion after remand), *cert. denied*, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982) (victim was abducted from her car and killed); *Garza Garza v. State*, 788 S.W.2d 651 (Tex.App.— Corpus Christi 1990, no pet.) (appellant killed one victim, placed gun to head of sexual assault victim and told her she would be killed, then drove her to Florida); *Guerra v. State*, 690 S.W.2d 901 (Tex.App.—San Antonio 1985, no pet.) (testimony indicated that, prior to murder, victim was forced from bar to car and that deadly force was used to restrain her).

straint was satisfied because 1) the girl was under 14 years of age and could not have consented to accompanying Earhart, 2) she was discovered in the woods far from home, and 3) was bound and shot in the head. *Id.* at 618. Therefore, by moving the girl far away from home, her liberty had been substantially interfered with and, since the State was not required to disprove consent in that case, even circumstantial evidence was a proper basis for establishing kidnapping.

In *Gribble v. State*, evidence, including the defendant's own testimony, indicated that the victim was removed from her house and taken to some woods (10 miles away) in an apparent effort to keep the victim from reporting that he had sexually abused her. 808 S.W.2d 65, 68 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991). Once in the woods, the victim began screaming and Gribble removed the victim's sash and strangled her with it. *Id.* Thus, the kidnapping had already occurred prior to the murder. Parenthetically, *Gribble* also states the obvious: that a dead body cannot be kidnapped. *Id.* at 72, n. 16. Therefore, the binding and removal of the deceased victim in the case at bar (the coroner's testimony suggested that she was dead prior to her placement in the car trunk) is irrelevant to the issue of kidnapping.

### C. *Other States' Kidnapping Cases*

#### 1. *Cases Requiring Slight Movement*

Several states have taken the approach that only slight movement is necessary to support a kidnapping charge.[2] Those states "frequently reason[ ] that it is the fact of forcible removal, and not the distance of the removal which constitutes the crime of kidnapping." Robert A. Shapiro, *Seizure or Detention for Purpose of Committing Rape, Robbery, or Similar Offense as Constituting Separate Crime of Kidnapping*, 43 A.L.R.3d 699, 702 (1972).

During a robbery, in *Turner v. Housewright*, there was no merger with the crime of kidnapping where the defendant brought the victims into a house at gunpoint and then moved them from room to room for four hours. 599 F.Supp. 1358 (D.Nev.1984), *aff'd*, 779 F.2d 29 (9th Cir.1985).

Arizona long ago held that kidnapping had occurred where the defendant moved the victim through a house and outside to a cabana before committing a rape. *State (Arizona) v. Jacobs*, 93 Ariz. 336, 380 P.2d 998 (1963), *cert. denied*, 375 U.S. 46, 84 S.Ct. 158, 11 L.Ed.2d 108 (1963). The Arizona Supreme Court reasoned that, although the crime scene was small, a kidnapping had occurred because it "preceded and was complete before the rape." Therefore, the "component parts of the two crimes [were] distinct and separate." *Id.* at 1003. Later Arizona cases have followed this view. *See e.g.*, *State (Arizona) v. Williams*, 111 Ariz. 222, 526 P.2d 1244 ([Panel op.] 1974) (victim was forced into bedroom at gunpoint and then raped);

2. *See, e.g., Harris v. State (Arkansas)*, 299 Ark. 433, 774 S.W.2d 121, 124 (1989) (evidence sufficient for kidnapping where, after victim's escape, defendant twice chased victim and dragged her from one building to another); *People (Colorado) v. Powell*, 716 P.2d 1096 (Colo.1986) (moving victim from one car to another prior to rape increased the risk of harm to the victim and constituted kidnapping); *State (Connecticut) v. Jones*, 215 Conn. 173, 575 A.2d 216 (1990) (grabbing jogger from center of road and dragging her completely off road provided sufficient movement for kidnapping); *Carron v. State (Florida)*, 414 So.2d 288 (Fla.Dist.Ct.App. [2nd Dist.] 1982), *approved of in* 427 So.2d 192, 193 (Fla. 1983) (moving victims through home at gunpoint, then tying victims and placing them in a bathtub substantially decreased defendants' chance of detection and kidnapping was not, therefore, incidental to crime of robbery); *Davis v. State (Georgia)*, 180 Ga.App. 190, 348 S.E.2d

730, 732 (1986) (evidence of kidnapping sufficient where victim was forcibly carried to area behind her house prior to rape); *State (Kansas) v. Bourne*, 233 Kan. 166, 660 P.2d 565, 567 (1983) (moving girls into bedroom where others would be prevented from aiding them constituted kidnapping as separate from crime of rape); *State (North Carolina) v. Davidson*, 77 N.C.App. 540, 335 S.E.2d 518, 520 (1985), *rev. denied*, 315 N.C. 393, 338 S.E.2d 882 (1986) (moving victims 35 feet at gunpoint prior to binding them constituted crimes of kidnapping and robbery because moving the victims was unnecessary to completion of the robbery); *Coram v. Commonwealth (Virginia)*, 3 Va.App. 623, 352 S.E.2d 532, 534 (1987) (moving victim 20 feet into bushes to facilitate rape attempt constituted kidnapping because the movement increased the possibility of harm to the victim by lessening the chance that the crime would be detected).

*State (Arizona) v. Burchett,* 107 Ariz. 185, 484 P.2d 181 (1971) (child lured to car and then car was pulled into alley).

The Delaware Supreme Court has ruled that, where a victim was forced into her car under threat of death, the restraint used was a substantial interference with her liberty (that is, in excess of the usual restraint incident to the underlying crime of unlawful sexual conduct). *Coleman v. State (Delaware),* 562 A.2d 1171 (Del.1989), *cert. denied,* 493 U.S. 1027, 110 S.Ct. 736, 107 L.Ed.2d 754 (1990).

The Virginia Supreme Court has similarly confronted and resolved this issue. In *Hoke v. Commonwealth (Virginia),* the court upheld convictions for robbery, abduction, rape, and capital murder because the abduction had been separate from the restraint necessary to perpetuate the rape and robbery where the victim was tied and gagged for a period of several hours. 237 Va. 303, 377 S.E.2d 595 (1989), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989).

Finally, the Kansas Supreme Court has undertaken an in-depth review of the issue and concluded that, although its kidnapping statute requires no particular distance of removal in order to constitute the crime, some limitations are implicated. *State (Kansas) v. Buggs,* 219 Kan. 203, 547 P.2d 720 (1976). The *Buggs* case, a combination robbery and rape, delineated the minimum threshold of the crime in this manner:

> [I]f a taking or confinement is alleged to have been done to facilitate the commission or another crime, to be kidnapping the resulting movement or confinement:

> (a) Must not be slight, inconsequential and merely incidental to the other crime;

> (b) Must not be of the kind inherent in the nature of the other crime; and

> (c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

> For example: A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is. *The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not kidnapping; the removal from a public place to a place of seclusion is.* The forced direction of a store clerk to cross the store and open a cash register is not kidnapping; locking him in a cooler to facilitate escape is. The list is not meant to be exhaustive, and may be subject to some qualification when actual cases arise; it nevertheless is illustrative of our holding.

*Id.,* 547 P.2d at 731 (emphasis added).

While the Kansas statute differs from our own,[3] the *Buggs* case summarizes a proposition basic to a finding of kidnapping regardless of the amount of asportation necessary to implicate the crime: kidnapping cannot occur unless the act giving rise to it has a separate meaning from any other crime.

### 2. Cases Requiring Substantial Movement

In contrast to the cases cited above, many states adhere to the more traditional view that movement must be substantial to qualify as kidnapping.[4] These cases generally rea-

---

**3.** *Cf.* the Kansas law operative at the time of the *Buggs* case with our own Penal Code §§ 20.01 *et. seq., ante:*

> Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:
> (a) For ransom, or as a shield or hostage; or
> (b) To facilitate flight or the commission of any crime; or
> (c) To inflict bodily injury or to terrorize the victim or another; or
> (d) To interfere with the performance of any governmental or political function.
> KAN.STAT.ANN. § 21–3420 (1970).

**4.** *See, e.g., Alam v. State (Alaska),* 776 P.2d 345, 349–50 (Alaska Ct.App.1989), *rev'd on other grounds,* 793 P.2d 1081 (Alaska Ct.App.1990) (kidnapping not present where restraint incidental to defendant's intent to commit another crime); *White v. State (Arkansas),* 301 Ark. 74, 781 S.W.2d 478, 481 (1989) (movement of victim insufficient to sustain kidnapping conviction in addition to rape); *People (California) v. Martinez,* 150 Cal.App.3d 579, 597, 198 Cal.Rptr. 565, 577–78 ( [2d Dist.] 1984) (movement and detention of victims within their residence did not constitute kidnapping where incidental to burglary, robbery and rape); *State (Connecticut) v. Amarillo,* 198 Conn. 285, 503 A.2d 146, 157–58 (1986) (forcing

son "that movements merely incidental to the commission of the crime and which do not substantially increase the risk of harm over and above that necessarily present in the crime do not constitute the separate crime of kidnapping." *Shapiro*, 43 A.L.R.3d at 702.

In *Robinson v. U.S.*, the victim was seized (without a weapon) and dragged 63 paces before being thrown to the ground. 388 A.2d 1210, 1212 (D.C.Ct.App.1978). A kidnapping, however, did not occur because the asportation was incidental to and indistinguishable from the attempted rape. *Id.*

The California Supreme Court found kidnapping in a case in which a robbery victim was moved 10 to 13 blocks while being held under a gun-like cigarette lighter. *In re Earley*, 14 Cal.3d 122, 120 Cal.Rptr. 881, 883–84, 534 P.2d 721, 723–724 (1975). The court discussed a number of cases, some holding that brief movements or movements within a single location were not kidnappings, but were part of the intended offense, and went on to hold that the distance the victim was moved did substantially increase the risk of harm to the victim. *Id.*, 120 Cal.Rptr. at 886, 534 P.2d at 726. Because the movement was not " 'merely incidental to the commission of the robbery[,]' " kidnapping was present. *Id.* at 886–87, 534 P.2d at 726–727 (citations omitted).

Consistent with the discussion within *Earley*, a California court of appeals, in *Bryant v. Craven*, previously held there was no kidnapping where, during a robbery, persons were moved around a store. 19 Cal.App.3d 933, 97 Cal.Rptr. 40 (2nd Dist.1971). However, kidnapping was ultimately found in that case because some persons were transported two to three miles in a car. *Id.*

In Illinois, an aggravated kidnapping conviction was reversed where the objective, motive, and purpose (rape) of the defendant remained unchanged until after the rapes were accomplished. *People (Illinois) v. Ford*, 44 Ill.App.3d 94, 2 Ill.Dec. 645, 649, 357 N.E.2d 865, 869 (4th Dist.1976). Additionally, the penalty for the offense of aggravated kidnapping was less severe than that for rape. *Id.*

In *State (Ohio) v. Malone*, an appellate court reversed a case in which rape and kidnapping convictions were returned. 15 Ohio App.3d 123, 472 N.E.2d 1122 (1984). The victim was forcefully moved a short distance, immediately robbed, and then raped four times. *Id.*, 472 N.E.2d at 1123. The court followed precedent from the Ohio Supreme Court and reasoned that, because kidnapping did not substantially increase the duration of restraint or the risk of harm to the victim that was involved in the underly-

victim at knifepoint to drive across state lines prior to sexual assault constituted kidnapping); *Brinson v. State (Florida)*, 483 So.2d 13, 15–16 (Fla.Dist.Ct.App. [1st Dist.] 1985), *rev. denied*, 492 So.2d 1335 (Fla.1986) (where victims moved between rooms of house and bound, movement considered slight and inconsequential and kidnapping not implicated as separate from crime of armed robbery); *People (Illinois) v. Young*, 115 Ill.App.3d 455, 71 Ill.Dec. 259, 270–72, 450 N.E.2d 947, 958–60 ( [2nd Dist.] 1983), *later proceeding* 136 Ill.App.3d 107, 90 Ill.Dec. 725, 482 N.E.2d 1008 ( [2nd Dist.] 1985) (seizing victim and throwing her against wall before raping her did not implicate crime of kidnapping as apart from crime of rape); *Thomas v. State (Indiana)*, 509 N.E.2d 833, 834–35 (Ind.1987) (kidnapping present where victim was forced from car into abandoned building prior to rape); *State (Maine) v. Bunker*, 436 A.2d 413, 415–17 (Me.1981) (kidnapping distinct from rape where defendant picked up victim and drove 13 miles to a secluded area, had intercourse, then returned her two hours later to original location); *People (Michigan) v. Gwinn*, 111 Mich.App. 223, 314 N.W.2d 562, 569–71 (1982) (kidnapping implicated

where victim was forced into car at gunpoint, driven to another location and raped, then returned to area near her home); *State (Missouri) v. Stewart*, 615 S.W.2d 600, 602–04 (Mo.Ct.App. 1981) (evidence sufficient to support kidnapping conviction where risk of harm to victim increased after defendant, at knifepoint, drove victim to several locations for purpose of rape and detained victim for one hour); *People (New York) v. D'Angelo*, 166 A.D.2d 662, 561 N.Y.S.2d 83, 84 ( [2nd Dept.] 1990), *appeal denied*, 77 N.Y.2d 876, 568 N.Y.S.2d 919, 571 N.E.2d 89 (1991) (kidnapping evidence sufficient where rape victim driven through several New York boroughs and then into New Jersey prior to rape); *People (New York) v. Scattareggia*, 152 A.D.2d 679, 543 N.Y.S.2d 742, 744 ( [2nd Dept.] 1989) (kidnapping not indicated where evidence of crime offered was based on restraint incidental to and inseparable from the commission of rape and sodomy); *State (South Dakota) v. Reed*, 313 N.W.2d 788, 789 (S.D.1981) (where victim was forced to drive through city to an abandoned farmhouse, kidnapping, in addition to rape, occurred).

ing offense of rape, no conviction for that crime could stand. *Id.*

### D. *Texas Kidnapping Statute*

Without question, the difficulty with the Texas kidnapping statute lies in its overbreadth; its definition can be read to enlarge virtually any nonconsensual "restraint" into a kidnapping. Such an interpretation renders the knowingly or intentionally provisions of abduction meaningless because it essentially converts this offense into a strict liability crime. As mentioned, many crimes, especially rape, consist of some form of nonconsensual restraint. Therefore, the act of restraining is an inherent part of many attempted or completed assaultive offenses that do not, in every case, implicate kidnapping. More must be required in order to constitute this crime, and those factors are movement or confinement (either one) *combined* with the intent to abduct. Kidnapping is a crime requiring specific intent, and it should be charged accordingly; that is, when confronted with a crime scenario indicating multiple contemporaneous assaultive offenses, the crime of kidnapping generally will not be implicated unless 1) the duration of the victim's restraint is increased beyond that attendant to the associated offense or 2) the defendant's acts greatly increase the risk of harm to the victim beyond that presented by any other associated offense.

In the case at bar, the victim was, technically, moved in the moments prior to the murder. This being so, the record also reflects the conclusion of the medical examiner regarding three possible causes of death, the most probable of which would have resulted in rapid unconsciousness and death, but any of which would have produced death prior to any meaningful movement of the victim. As such, the duration of the movement did not exceed the amount of time necessary for the commission of the murder or sexual assault of the victim. Movement as limited as this is not an interference with a person's liberty substantial enough to serve as a basis for a finding of the restraint element under section 20.01 of the Penal Code. *See* TEX.PENAL CODE ANN. § 20.01 (Vernon Supp. 1988).

Furthermore, while it appears that the victim was technically restrained or confined during the episode, the intention of the confinement or restraint must be examined. In this case, Appellant's obvious and stated intention was to sexually assault the victim, not to kidnap her.

> I wanted her sexually real bad and that is why I lured her to my house.... I wasn't sure she was dead, so I started to tie her up so she would not struggle anymore. I got some nylons and pulled her feet behind her back. I tied her hands to her feet where she was bent out of shape.... After I was certain she was dead; tied up, I took off her shorts, so I could admire her body.... I know that by calling Mary Beth and luring her to the house was wrong and I really wanted to have her sexually and when she did not do so I killed her.

(Tr. Vol. 13, pp. 155–157).

Furthermore, the medical examiner testified that, although he found no medical evidence of sexual assault, "the sexual nature of the crime [was] obvious because of the positioning of the body and the way the body [was] tied up with the legs spread and [the] feet tied back underneath the body with the body arched to expose the genital area." (Tr. Vol. 13, p. 213). Clearly the intent of the restraint or movement, if any, in this case was sexual.

After reviewing all the relevant parts of the record in the case at hand, it is apparent that the prosecution chose what was, in their opinion, the easiest possible path to achieve the greatest possible offense suggested by the facts. As mentioned previously, the indictment originally alleged murder in the course of committing or attempting to commit aggravated sexual assault, as well as committing or attempting to commit kidnapping. The sexual assault portion of the indictment was lined through with the trial judge's permission. In a bench discussion in which the defense initially objected to testimony regarding the sexual nature of the offense, the prosecution candidly revealed that:

> The reason the pleadings were struck was not because we didn't believe we could

prove [capital murder in the course of sexual assault] beyond a reasonable doubt but because we didn't need to prove it up beyond a reasonable doubt to get a capital murder conviction in this case. All these offenses are or's [sic], all these attempts are or's [sic], and it was simply our—it was my decision, or the decision I made rather than have the jury confused immediately by the issues that were not necessary to the proof in this case to get a capital murder conviction, and because under the state of the evidence, the laws in this State, res gestae crimes are still admissible and always have been admissible before juries. And in this particular case, the confession, he lured her to the house to engage in sexual conduct, I think the relevancy of the fact of whether or not sexual conduct occurred goes to corroborate the confession, and goes to show the motive in this case. Now that's why I offered it.

Confident of a capital murder conviction, the State made the choice to abandon the sexual assault portion of the indictment and simply proceed on the less rigorous proof required under the kidnapping charge. However, given the absence of any real movement of the victim prior to her death, the "easier" elevating crime to support a capital murder charge was more likely committing or attempting to commit sexual assault.

By this Court announcing that facts such as these amount to the crime of kidnapping, the jurisprudence of this State will suffer the ills of strained reasoning. To allow a conviction under such a very narrow interpretation of either the movement element or the restraint element of the term restraint, alters the traditional concept of the crime and criminalizes behavior not usually considered kidnapping. As the term has always been understood, at least in its plain usage, kidnapping has required some intentional confinement, restraint or movement of the victim that is substantial (i.e. separate and distinguishable from the confinement, restraint or movement attendant to another offense). Movement that is merely incidental to the commission of a crime, such as murder, cannot further support a conviction for kidnapping. Indeed, our own statute requires a substantial interference with the victim's liberty,[5] yet the plurality's construction ignores that requirement and announces that the very slightest movement of a person, even in the midst of a different crime, constitutes kidnapping. Such a result will invariably lead, as here, to unfair extrapolations regarding a defendant's *mens rea* to commit the crime of kidnapping and will certainly produce absurd results.

II.

The Texas kidnapping statute, when linked with a charge of capital murder under facts such as these, renders infirm section 19.03(a)(2) of our Penal Code for federal constitutional purposes. The statute, utilized here as the supporting felony for capital murder, does not numerically limit the class of murderers subject to the death penalty; many criminals could, by moving a victim the slightest distance, be subjected to capital punishment.[6] *See generally Gregg v. Georgia,* 428 U.S. 153, 196–202, 96 S.Ct. 2909, 2936–2938, 49 L.Ed.2d 859 (1976). Upholding this conviction runs the serious risk of allowing section 20.03 of the Penal Code to become a refuge for the capricious charging of capital murder in situations that otherwise would not support such a charge. An outcome of that nature places the Texas scheme, at least as it applies to similar situations, in jeopardy. *See Gregg,* 428 U.S. at 196–207, 96 S.Ct. at 2936–2941; *see generally Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976).

In *Gregg,* petitioner attacked Georgia's aggravating feature that would authorize the death penalty "if the murder was 'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind,

---

5. *See* TEX.PENAL CODE § 20.01(1) (" 'Restrain' means to restrict a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him.").

6. In fact, the only murders that would not be subject to capital punishment under this interpretation would be those in which the defendant walked up and shot the victim as he was found. If the defendant so much as told the victim to stand, he could be convicted of capital murder.

or an aggravated battery to the victim,' contending that it is so broad that capital punishment could be imposed in any murder case." *Gregg*, 428 U.S. at 201, 96 S.Ct. at 2938. The Supreme Court declined to answer this allegation while acknowledging that it is "arguable that any murder involves depravity of mind or an aggravated battery[,]" but indicated that the "language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an *open-ended construction*." *Id.* (emphasis added.) This, the High Court assumed, was shown by the fact that "[i]n only one case has [the Georgia Supreme Court] upheld a jury's decision to sentence a defendant to death when the only statutory aggravating circumstance found was [that described above], and that was a horrifying torture-murder." *Id.* (citation omitted.) Although *Gregg* addressed whether the Georgia statute arbitrarily resulted in an imposition of the death penalty by a jury, there is no reason to think the same analysis would not apply to our system, and the Supreme Court seemed to imply that the proper case would attract its review of such an issue. Moreover, *Gregg* reviewed the Georgia jury procedure in sentencing a defendant, not the prosecution's selection power over how the defendant is to be charged. Without question, the acts of the prosecution are more readily subject to a review for a claim of capriciousness than are those of a jury.

### III.

The plurality concedes that, had they been construing the common law offense of kidnapping, they might be willing to agree with the foregoing analysis. *Plurality Opinion* at

477, n. 10. Because the offense is presently codified in statutory form, they feel justified in ignoring the common law background from which the legislature drafted the statute. Contrary to the plurality's view,[7] a court may consider the common law when construing a statute. TEX.GOVT.CODE ANN. § 311.023(4) (Vernon 1994). The need to look to the common law is obvious in a situation, such as this one, where the statute is ambiguous and results in an unconstitutional interpretation.[8] Furthermore, the provisions of the Penal Code are to be "construed according to the fair import of their terms, to promote justice and effect the objectives of the code." TEX.PENAL CODE § 1.05(a). The plurality's construction fails to do this. Therefore, I implore the legislature to amend § 20.03 to clearly state that the offense of kidnapping requires substantial movement, confinement or restraint that is not merely incidental to the actions required to commit another offense.[9]

### IV.

Mindful of the foregoing discussion and adherent to the "plain meaning" teachings of *Boykin*,[10] I do not find that kidnapping is implicated by these facts. Thus, no basis existed for sending a charge to the jury that implicated the crime of kidnapping as the underlying felony for capital murder. Appellant, realizing as much, properly moved at trial for a directed verdict in his favor, but was denied his motion. The evidence, viewed in a light most favorable to the prosecution, is insufficient to support a conviction of capital murder based on kidnapping. *See Nelson v. State*, 848 S.W.2d 126, 131 (Tex.Crim.App. 1992). Therefore, Appellant should be ac-

---

7. *See* Penal Code § 1.05.

8. *See* discussion in Part II, *supra*.

9. The drafters of the Model Penal Code were aware of the problems associated with the Majority's interpretation and guarded against them by requiring a substantial movement or confinement.

A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period in a

place of isolation, with any of the following purposes:
a) to hold for ransom or reward, or as a shield or hostage; or
b) to facilitate commission of any felony or flight thereafter; or
c) to inflict bodily injury on or to terrorize the victim or another; or
d) to interfere with the performance of any governmental or political function.
MODEL PENAL CODE § 212.1 (1974) (emphasis added).

10. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim.App.1991).

quitted of the charge of capital murder. *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); *Stephens v. State,* 806 S.W.2d 812, 816 (Tex.Crim.App.1990).

Under the facts and procedural history of this case, I would reverse Appellant's conviction for capital murder and acquit the defendant.

BAIRD, J., joins this opinion.

CAMPBELL, Judge, dissenting.

Because I cannot agree with the plurality's conclusion that the search of appellant's home was illegal under the Fourth Amendment, I must dissent.

A trial court's decision at a suppression hearing to admit or exclude evidence is subject to an abuse of discretion standard of review. *Alvarado v. State,* 853 S.W.2d 17, 23 (Tex.Crim.App.1993). In the instant case, I believe the record clearly shows that the trial court did not abuse its discretion in denying appellant's motion to suppress.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. Amend. IV. Warrantless searches are *per se* unreasonable, *Kelly v. State,* 669 S.W.2d 720, 725 (Tex.Crim.App.1984), subject to only a few exceptions, one of which is the emergency doctrine. *See Bray v. State,* 597 S.W.2d 763 (Tex.Crim.App.1980). Under the emergency doctrine, "[a] warrantless search may be justified by a need to act immediately to protect or preserve life or to prevent serious injury." *Id.* at 764. That need to protect or preserve life or to prevent serious injury justifies police actions that would otherwise be illegal absent the emergency. *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978).

Any number of situations may give rise to implementation of the emergency doctrine. W. LaFave, *Search and Seizure* § 6.6(a) at 702 (2d ed. 1987). The emergency doctrine may justify entry into a dwelling to seek a person who has been reported missing. *People v. Wharton,* 53 Cal.3d 522, 280 Cal.Rptr. 631, 665, 809 P.2d 290, 324 (1991). Likewise, the emergency doctrine may justify entry into a dwelling to discover evidence or a "lead" which could reveal the location of the missing person elsewhere. *Chaney v. State,* 612 P.2d 269, 277 (Okla.Crim.App.1980). Once legally inside a dwelling under the emergency doctrine, police may seize evidence in plain view. *Bass v. State,* 732 S.W.2d 632, 635 (Tex.Crim.App.1987).

In determining whether a warrantless search was justified by an emergency, we use an objective standard of reasonableness. *Janicek v. State,* 634 S.W.2d 687, 691 (Tex. Crim.App.1982). Under an objective standard of reasonableness, we evaluate police conduct in light of the facts and circumstances known to the police at the time the conduct at issue took place. *Garcia v. State,* 827 S.W.2d 937, 941, n. 2 (Tex.Crim.App. 1992), *citing Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). This means that, in analyzing the decision of the Kingsville police officers in the instant case, to enter appellant's residence without a warrant, we must take into account all of the facts at the officers' disposal and determine whether those facts would warrant a reasonable officer to believe that an emergency existed.

In the instant case, the following facts were known to the police officers when they decided to enter appellant's residence without a warrant: 1) the victim had been missing for over two days; 2) the victim was acquainted with appellant; 3) the victim was last seen on the morning of her disappearance in the neighborhood of appellant's home; 4) the victim's automobile was discovered in a parking lot within three blocks of appellant's home; 5) approximately one month before, appellant had lured another female to his residence and had attempted to sexually assault her; 6) the victim was last seen wearing a red blouse; 7) the suitcase abandoned by appellant at the motel contained a piece of red cloth that appeared to be blouse material and a large pair of scissors, both of which had blood on them; 8) the suitcase also contained cut-up pieces of women's clothing, including a portion of a pair of blue pajama pants that had been cut off; 9) according to appellant's uncle, Judge Bennett, who, at his own initiative, broke into appellant's home, the legs to a pair of blue pajama pants were in the master bedroom of

appellant's home, along with other pieces of cut-up women's clothing; 10) according to Judge Bennett, there appeared to have been a struggle and a "violent act" in the master bedroom.

The officers also were aware of an "extreme urgency" on the part of Judge Bennett for them to enter appellant's home. According to Captain Gomez, Judge Bennett told him "you need to get in there." Additionally, nothing in the record denotes that Judge Bennett indicated to Captain Gomez that his search of appellant's home was exhaustive, so as to exclude the possibility that the victim was somewhere within.

Taking into account all of the information at the officers' disposal when they decided to make the warrantless entry into appellant's residence, I would conclude that those facts would warrant a reasonable officer to believe that an emergency existed. The plurality dismisses the possibility of an emergency based on the officers' subjective thought processes, stating: "The police were not expecting to find a body at the house, much less an alive and injured victim in need of assistance." The plurality fails to give effect to our prior case law, which clearly mandates an inquiry based on *objective* reasonableness. *Janicek*, 634 S.W.2d at 691; *Bray*, 597 S.W.2d at 765.[1] Under such an inquiry, the subjective thoughts and beliefs of the officers are not determinative; the only consideration is whether the facts would warrant a reasonable officer in their position to believe that an emergency existed. *See Garcia*, 827 S.W.2d at 941.

Even under a purely subjective analysis, however, the record contains sufficient evidence to support the trial court's denial of appellant's motion to suppress based on the emergency doctrine. At the suppression hearings, Captain Gomez testified as follows:

Q: Okay. You weren't looking for—What you went in and were looking for was a body, wasn't it?

A: No. No, sir. I was not looking—I was hoping to find the young girl alive, sir.

Q: You were looking for a person.

A: I was looking for a person, yes, sir.

\* \* \* \* \* \*

A: ... I was afraid that if [the victim] was being held against her will, somewhere, she needed to get away or [be] rescued. I didn't know if she was in that house or not, sir.

At a suppression hearing, the trial court is the sole judge of the credibility of witnesses and the weight attributable to the witnesses' testimony. *Alvarado v. State*, 853 S.W.2d at 23. The trial court may believe or disbelieve all or any portion of a witness's testimony. *Id.* I believe the foregoing excerpts from Captain Gomez's testimony at the suppression hearings were sufficient evidence upon which the trial court could have based a finding that the officers' decision to make a warrantless entry of appellant's residence, to find either the victim or evidence leading to the victim's discovery at another location, was subjectively reasonable under the emergency doctrine.

I would also conclude that the seizure of the victim's body from the trunk of appellant's parents' automobile, located inside the garage attached to appellant's residence at the time of the search, was justified under the emergency doctrine. The United States Supreme Court, in *United States v. Ross*, 456 U.S. 798, 820–21, 102 S.Ct. 2157, 2170–71, 72 L.Ed.2d 572 (1982), stated that "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the

1. Although the majority cites *Bray* and *Janicek*, apparently for the proposition that an objective standard of reasonableness should be used in determining whether to justify a warrantless search under the emergency doctrine, the following language indicates that the majority is confused about the meaning of objective reasonableness: "The State need only show [to demonstrate the applicability of the emergency doctrine] that

the facts and circumstances surrounding the entry and search were such that *the officers reasonably believed that an emergency existed....*" A truly objective analysis would focus upon what a hypothetical reasonable officer would believe, not on what the officers in the instant case actually believed. Apparently, the majority does not completely understand the difference between an objective and a subjective inquiry.

search."[2] Applying this language to the facts of the instant case, the police officers who entered appellant's home under the emergency doctrine, to look for the victim or evidence of the victim's whereabouts, were justified in opening the trunk of appellant's parents' car and retrieving the victim's body since, in searching for the victim, the officers could have reasonably believed that the victim was concealed inside. *See also People v. Wharton,* 280 Cal.Rptr. at 665, 809 P.2d at 324 (officer conducting warrantless search under the emergency doctrine was justified in cutting through plastic container located inside victim's residence and retrieving victim's body). Additionally, the fact that, in the instant case, the container in which the victim's body was found was an automobile does not mean that the police needed separate justification to search inside it. *See People v. Powers,* 173 A.D.2d 886, 570 N.Y.S.2d 362, 364–65 (1991).

Concerning the remaining evidence seized from appellant's residence, I would find no error regarding its admission at trial. The lawfulness of an emergency search terminates once the emergency ends. *Bray,* 597 S.W.2d at 764. However, when police discover a potential homicide scene, they may undertake a prompt warrantless search of the premises to see if there are additional victims or if a killer remains on the premises. *Mincey v. Arizona,* 437 U.S. at 392, 98 S.Ct. at 2413. In the instant case, the police continued to search appellant's residence after they discovered the victim's body. It is unclear from the record exactly which pieces of evidence were discovered before the body was found and which were discovered afterward. However, the record reflects that each of the items seized from appellant's residence and later admitted at the trial were found in locations which would have been in plain view of the officers when searching for additional victims, or in places in which a person could have been sequestered. Therefore, I believe there was no error in the seizure of those items.

Even assuming *arguendo* that some or all of the items seized from appellant's residence, other than the victim's body, were seized illegally, I conclude that any error arising from their admission at appellant's trial was harmless under Texas Rule of Appellate Procedure 81(b)(2). In order for error to be construed harmless under Rule 81(b)(2), an appellate court must determine that such error was harmless beyond a reasonable doubt. *Arnold v. State,* 786 S.W.2d 295, 298 (Tex.Crim.App.1990). We have previously set forth the applicable standard for defining harmless error:

> When determining whether erroneously admitted evidence is harmless beyond a reasonable doubt, the question is whether ... there is a reasonable possibility that the erroneously admitted evidence contributed to the verdict obtained. In other words, was there a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion beyond a reasonable doubt as to the issue in question? If the answer to the question is 'yes,' then the error cannot be considered harmless.

*Jones v. State,* 833 S.W.2d 118, 127 (Tex. Crim.App.1992) (citations omitted).

In the instant case, appellant made a written confession, which was admitted into evidence at trial. The confession related, in lurid detail, how appellant enticed the victim to his home and then, once she arrived, ambushed her and, after a struggle, strangled her. Appellant's confession was corroborated extensively by the evidence obtained from the victim's body. Therefore, I conclude that, assuming *arguendo* that some or all of the evidence discovered in appellant's residence was obtained outside the parameters of the emergency doctrine, there is no reasonable possibility that that evidence moved the jury from a state of nonpersuasion concerning appellant's guilt to one of persuasion beyond a reasonable doubt, given appellant's detailed confession and the victim's body which was legally discovered under the emergency doctrine.

I agree with the plurality that there is sufficient evidence in the record to support the kidnapping element of appellant's capital murder conviction. However, I cannot agree

---

**2.** I note that the search in *Ross,* as in the instant case, was conducted without a warrant.

with the plurality's conclusion that the search of appellant's home was illegal. I would conclude that the trial court did not err in admitting the evidence obtained from appellant's home. Therefore, I would not reverse on the search issue, and would proceed to address the remaining points of error.

I respectfully dissent.

McCORMICK, P.J., and WHITE and MEYERS, JJ., join.

Before the court en banc.

### OPINION ON STATE'S MOTION FOR REHEARING

MANSFIELD, Judge.

Richard Brimage, Jr., appellant, was convicted of capital murder—murder committed in the course of committing or attempting to commit a kidnapping—under Tex.Penal Code 19.03(a)(2) (1985). The jury answered the special issues under Tex.Code Crim.Proc. 37.071(b) (1985) in the affirmative, and punishment was assessed at death in accordance with Tex.Code Crim.Proc. 37.071(e) (1985).

Automatic appeal was made to this Court which, on September 21, 1994, reversed the judgment of the trial court and remanded the cause for a new trial. The State's motion for rehearing was granted on February 8, 1995. We now affirm the judgment of the trial court, and will proceed to address appellant's twelve points of error.

### I. Facts

During the morning of October 5, 1987, appellant telephoned Mary Beth Kunkel, the complainant in this matter. Appellant knew complainant because his supervisor at the Lockheed plant where he worked was her boyfriend. Complainant's mother initially answered the phone and appellant said his name was "George."

Appellant asked complainant to come by his house on West Richard Street in Kingsville to pick up some drafting tools belonging to her boyfriend. He told her not to tell her mother where she was going. Complainant left her home about 8:00 a.m. and was ob-

served turning her car onto West Richard Street (appellant lived at 1135 West Richard Street) at that time. Her mother testified that at the time complainant left, she was wearing a red shirt or blouse, a turtleneck and green walking shorts.

The house at 1135 West Richard Street was owned by appellant's parents. Appellant had his own room and had keys to the house and to his parents' cars. At the time the events described herein occurred, appellant's parents were out of town on an extended vacation.

Later on October 5, complainant's boyfriend, Michael Beagley, noticed her car parked at Texas A & I University with her purse inside the car. As the car was unlocked and parked on a part of the Texas A & I campus where complainant never parked, Beagley became concerned about her safety. It is not clear from the record exactly when the police were notified as to the concern about complainant's whereabouts, but Captain George Gomez of the Kingsville Police Department testified that he became aware of a missing persons report concerning complainant during the morning of October 6. He commenced an investigation that afternoon.

On Wednesday, October 7, friends of complainant began circulating fliers with her picture calling attention to her disappearance. The police investigation soon uncovered information that appellant might be involved, i.e., he had quit his job without informing his employer, he knew complainant, her car was parked on the part of the Texas A & I campus near his residence, and inability on the part of either the police or his employer to contact him.[1] That morning, the police went to appellant's residence. No one responded to their knocks on the door. After finding all the doors and windows locked and the lights out, the police concluded no one was home and left.

Captain Gomez contacted Roy Turcotte, an attorney and relative of appellant. He told Turcotte he had reason to suspect appellant

---

1. The police also had information that appellant had attempted to assault a woman, Susan May, a month earlier at his residence.

in the disappearance of complainant and asked for permission to search appellant's residence. Turcotte stated he would try to contact appellant's parents, but that he did not have authority to give consent to a search of the residence.

Later that day, Gomez went to the Rodeway Plaza Inn in response to a phone call, and was informed that appellant had stayed in Room 119 the night before and had not been seen since. Testimony at a pretrial hearing showed that between 9:00 p.m. and 9:30 p.m. on October 6, appellant paid cash for a one-night stay. Adelfa Flores, who was employed as a maid, testified that she entered Room 119 at 11:55 a.m. and 2:00 p.m. on October 7 in order to clean the room, and found a suitcase and lots of papers. Based on instructions from the desk clerk, she returned at 3:00 p.m. and, finding the room in the same state as before, placed everything (the papers) in the suitcase, closed the suitcase, and brought it to the front desk pursuant to the desk clerk's instructions. She also testified she saw appellant several times on October 6 but never saw him on October 7. Checkout time at the Rodeway Plaza Inn for a guest paying for a one-night stay for the night of October 6–7 would be 12:00 p.m. on October 7.

Gomez stated that he went to the Rodeway Plaza Inn at about 8:30 p.m. on the 7th following a phone call from the motel. He opened the suitcase and found "a pair of scissors, a piece of red knit material that had been cut and appeared to have been cut with the scissors that were in the suitcase because the edges had red lint on them, and long strands of hair and some other—and—and the red piece of cloth had what appeared to be a dried bloodstain on it, sir." Gomez concluded that the items in the suitcase were connected to complainant's disappearance.

Gomez returned to the police station and met with Attorney Turcotte and State District Judge Max Bennett, appellant's maternal uncle. He then proceeded to appellant's residence with several police officers where they were met by Turcotte and Judge Bennett. Turcotte and Judge Bennett let them in the house and a search commenced.

The master bedroom was littered with clothing and other items. (Note: Appellant's father testified at trial that the house was clean and tidy at the time they left on vacation.) There was a sheet covering the window even though it was already screened by both drapes and blinds. Part of the bottom of the window was broken. Some of the clothing was cut up and there were several bloodstains around the room. A pair of green shorts were found on the floor, along with a cut up bra, in plain view near the laundry basket.

Captain Gomez then proceeded to the garage, which was attached to the house and had room for two cars. A yellow Cadillac was parked in the garage. As Gomez approached the car, he saw what appeared to be bloodstains on the left rear quarter panel and smelled "the odor of something that was dead." He opened the trunk and observed complainant's body, with much of her clothing cut away. Less than 48 hours had elapsed between the time the police had been notified of complainant's disappearance and discovery of her body.

Gomez testified that her wrists were bound, her legs were bent back behind her and tied to her elbows with shoelaces, and there was a ligature around her throat. He also testified there was something jammed down her throat and there were remnants of a red blouse on her.

The police remained at the house after discovery of complainant's body and gathered more evidence. They secured the house at about 2:00 a.m. on October 8 and returned later that day to collect additional evidence. No search warrant was obtained prior to these searches.

Based on the evidence obtained at appellant's residence, the Kingsville Police obtained an arrest warrant for appellant on October 8. Appellant was arrested the next morning at the King's Inn in Corpus Christi and was confined in the Corpus Christi jail pending transfer to Kingsville.[2] Appellant

---

**2.** Sergeant David Cook testified he read appellant his *Miranda* warnings at the time of arrest at 4:06 a.m. on October 9, in the company of several other officers.

was interviewed in the Corpus Christi jail by Adan Munoz, an investigator from the District Attorney's office for Kleberg, Nueces and Kenedy Counties. After being given the required written warnings by Munoz, appellant proceeded to give a written confession which describes in detail the last hours of complainant's life. The confession was admitted as State's Exhibit 235 and was taken by Adan Munoz and witnessed by Captain Gomez. Each page of the confession is headed by the written statements of rights required under Tex.Code Crim.Proc. Art. 38.22, § 2(a), and appellant acknowledged in writing by initialing, in each appropriate place, that he understood his rights and that he wanted to give up his rights and make a statement.

The confession in its entirety, reads as follows:

My name is Richard Lewis Brimage, Jr. I am 31 years old and I live at 1135 W. Richard, Kingsville, Texas. Last Thursday, October 1, 1987, I started trying to pick up some girls and party with. [sic] This went on through the weekend. On Monday, October 5, 1987 early at about 6 AM or 7 AM I called Mary Beth Kunkel at home. Her mother answered and I asked for Mary Beth. She came to the telephone and I told her I had some engineering tools for a gift for her boyfriend Mike. I knew if I told her they were for Mike she would come over to my house. She agreed to come over. She came over and I took her to the back bedroom where the tools were. As she looked at [sic] tools I grabbed her and she said, what Richard, what. I was standing behind her and grabbed her by the shoulders. She struggled and started screaming and I forced her into the master bedroom. She continued screaming and I kept hitting her and choking her. I wanted her sexually real bad and that is why I lured her to my house. We wrestled for a while and when she would not stop screaming, I finally choked her with my hands. I wasn't sure she was dead, so I started to tie her up [sic] so she would not struggle anymore. I got some nylons and pulled her feet behind her back. I tied her hands to her feet where she was bent out of shape. I re-

member seeing blood on her face and blood on my pants. I want to say that during this time another guy was with me. His name is Leo Molina. Leo had been with me for the past three or four days. I woke him up to tell him Mary Beth was coming over. I told him to wait in the back bedroom where all the struggle took place. While she was screaming we decided to inject her with some cocaine to stop her from screaming. We managed to do so. She kept going wild, trying to escape. I kept telling [sic] to stop screaming. Leo, I remember was trying to feel up her shorts and touch her between her legs. After I was certain she was dead, tied up, I took off her shorts, so I could admire her body. Before this I told Leo to take her car from in front of my house and park it at the college campus somewhere. While Leo was gone I picked up Mary Beth and put her in the trunk of my parents' car. I had already told Leo to walk down Richard Street and I would come pick him up in my car. I saw him walking and I picked him up. I then drove to Alice, Texas and Leo was with me. We got a motel room and we stayed there until late Monday afternoon. I sat in the motel room until 5 or 6 in the afternoon. Leo had left the room to supposedly look for a cousin and find a way to get rid of the body and car. I now realized he had left me alone with the body and car. I first made a phone call to my neighbor, Mr. Robbins, pretended to be my dad and told Mrs. Robbins that I wanted someone to check the house, because the phone was busy. Mrs. Robbins told me that the garage door was up, my truck was in the garage and no signs of anyone in the house. I now decide to drive back to Kingsville.

On the way back I turned towards Benavides and stopped to look at the body. I wanted to touch her, but could not [sic] it. I then drove back to my house. It's still daylight and I park the car back in the garage and shut the garage door. I was also the one that wrote out a note to use for a reference while I talked to her on the telephone. By her I mean Mary Beth. I did use the name George when I talked to

her. I also remember cutting her blouse with a pair of scissors because I could not take it off, because she was tied up. When I returned from Alice I took off in my truck and went to look for Leo. I found him at his house and got some more cocaine. I had gone to the Motel 6 in Kingsville, first, registered first though and then looked for Leo. I want to correct this, it was the Best Western, Kingsville, not Motel 6. I know that by calling Mary Beth and Luring her to the house was wrong, and I really wanted to have her sexually and when she did not do so I killed her.

I'm giving this statement of my own free will, with no promises in return for this statement. I'm fully aware of my actions now and will voluntarily sign this statement.

The case received a massive amount of publicity in the greater Corpus Christi area, including coverage on both English and Spanish language radio stations, television and in local newspapers. The trial court, concerned about this pretrial publicity, on its own motion transferred the case from Kleberg County to Comal County, after conducting a hearing on December 4, 1987.

Leo Molina, the individual referred to in appellant's confession, testified at appellant's trial. Molina's version of the events that transpired on the morning of October 5 differed substantially from appellant's version. Molina testified that he saw appellant drag the screaming complainant into the back bedroom.[3] He then testified he observed appellant hitting complainant and observed him injecting her with cocaine. Molina testified he left the room while the struggle was still going on. Molina also testified he sold appellant cocaine on several occasions prior to October 5, 1987 and saw appellant inject himself with cocaine on several occasions. Molina denied any role in the death of complainant other than "holding her feet down with his foot" momentarily. Molina admitted he was convicted of a felony involving selling

marihuana in 1977 and he received a ten-year term for aggravated robbery in 1981 (he was released in May of 1984).

Molina testified he agreed to plead guilty to the offense of murder and agreed to accept a sentence of fifty years for the death of complainant. He testified further he agreed to testify against appellant and he would be granted immunity with respect to that testimony.

Joseph Rupp, M.D., Medical Examiner for Nueces County since 1970 performed the autopsy on complainant's body. He testified complainant could have died from any one of three causes: (1) ligature strangulation; (2) manual strangulation; and (3) asphyxiation by the sock obstructing her airway. He testified that he could not determine at what point during appellant's attack complainant died. He testified further that it was likely the sock was stuffed down her throat after manual strangulation, when she was unconscious, and that appellant may not have known she was likely dead at that point. He testified the ligature in and of itself was sufficient to kill her and was placed around her neck after she was already dead.

Dr. Rupp testified there was no sign of injury to complainant's vaginal or anal areas nor were any seminal fluids or pubic hairs not belonging to the complainant found. He also testified that the toxicology report indicated complainant's urine tested positive for cocaine. He testified that while he could not pinpoint a time of death, it resulted rather quickly. Finally, he testified, "My opinion is that all three were calculated to cause death. The manual strangulation, the sock shoved all the way into the throat, and the ligature around the neck were all calculated to produce death."

After the State and the defense concluded their presentations, the jury was instructed as to the statutory definitions of attempt, kidnap, restrain and abduct.[4] The jury was charged as follows:

**3.** He also testified he heard her yell, "Please don't hit me. Don't hurt me. I'll do anything."

**4.** It should be noted that the indictment originally also charged appellant with intentionally causing complainant's death "while in the course of

committing and attempting to commit the aggravated sexual assault of Mary Beth Kunkel." The State struck this language from the indictment, with consent of the trial court, on the first day of trial.

Now if you find from the evidence beyond a reasonable doubt that on or about October 5, 1987, in Kleberg County, Texas, that the defendant, Richard Brimage, Jr. did then and there intentionally cause the death of an individual, Mary Beth Kunkel, by strangling her with his hands or by strangling her with a ligature, or by suffocating her with a sock, in the course of committing or attempting to commit the kidnapping of Mary Beth Kunkel, then you will find the defendant guilty of capital murder as charged in the indictment.

The jury found appellant guilty of capital murder. During the punishment phase, the State called a woman who testified that on October 8, 1987 appellant offered women at the club she worked at money to come "party" with him. She also testified that he called her later that night to come to his motel room; she declined and never heard from him again.

A second woman, Susan May, who knew appellant and one of his sisters, testified appellant called her on September 21, 1987. She testified appellant told her he wanted her to come over to surprise his sister, who was returning from a trip. She agreed to come to appellant's house. Once she was in the house, she testified appellant hit her from behind on the head with an object and then he jumped on top of her. She testified further that, after a minute or two, "something snapped," he let her up and acted "more or less apologetic." He asked her not to call the police. She left his house and, after making a couple of stops, went to the police station. She testified she reported what happened, but never filed formal charges. Finally she testified she had no further contact with the police concerning this matter prior to October 5, 1987.

Evidence was introduced that appellant pled guilty in Washington to possession of stolen property on September 30, 1977 and successfully completed a two-year term of deferred adjudication for that offense. The offense arose out of a purse snatching involving an elderly lady; appellant did not snatch the purse but was found in possession of cash and jewelry taken from the purse.

On May 5, 1983, appellant pled guilty in Texas to the felony offense of forgery. Appellant's father testified that appellant forged his parents' signatures on checks drawn on their bank accounts to finance his drug habit. Appellant was sentenced to five years' imprisonment, suspended, and was placed on probation for five years. About 2½ years later, appellant's probation was revoked for failure to report to his probation officer and for failure to pay a supervisory fee required after his release from a drug rehabilitation program, Cenikor. Appellant was sentenced to two years in prison and was released in January of 1987.

Appellant called relatives and friends as witnesses, who testified that appellant would not be dangerous in the future. Lester Ewing, a detention officer for Kleberg County, testified that appellant had behaved himself during the three or four months he had been an inmate in the Kleberg County Jail from the time of arrest through the duration of his trial. Neither the State nor appellant offered any expert testimony on the issue of appellant's future dangerousness.

The jury answered both special issues under Tex.Code Crim.Proc. Art. 37.071(b) (1985) in the affirmative. Appellant was sentenced to death in accordance with Tex.Code Crim.Proc. Art. 37.071(e) (1985).

## II. Appellant's Points of Error

In Point of Error Number One, appellant contends the trial court erred in ordering a transfer of venue from Kleberg County to Comal County on its own motion, over appellant's timely objection. In Point of Error Two, appellant claims the trial court erred in admitting, over appellant's timely objection, evidence and the fruits thereof which were obtained as a result of the search of appellant's residence because the search violated both the United States and Texas Constitutions, as well as the Texas Code of Criminal Procedure.

Appellant claims, in Point of Error Number Four, the trial court erred in failing to grant appellant's motion for new trial because its failure to control the conduct of the media during pretrial proceedings and the

trial itself resulted in appellant being denied due process of law.

In Point of Error Number Six, appellant argues because his confession was not voluntary, the trial court erred in failing to suppress the confession, over his timely objections. In a related Point of Error Number Seven, appellant contends the trial court erred in denying appellant's request to make findings of facts and conclusions of law as to the voluntariness of appellant's confession.

In Point of Error Number Eight, appellant contends the trial court erred in allowing the opinion testimony of Dr. Joseph Rupp on the ground that it was prejudicial.

Appellant contends, in Point of Error Number Nine, the trial court erred in failing to respond to appellant's timely request to instruct the jury as to what to do if the jury could not answer unanimously a Special Issue "yes" or if less than ten jurors answer a Special Issue "no."

In Point of Error Number Ten, appellant contends that the arrest of appellant was made pursuant to an unconstitutional arrest warrant and the trial court erred in overruling appellant's timely motion to suppress the evidence of appellant's arrest and the fruits thereof.

In Point of Error Number Eleven, appellant argues that the trial court erred in admitting in evidence certain articles found in appellant's residence and motel room because such evidence was irrelevant and resulted in unfair prejudice to appellant.

Appellant contends, in Point of Error Number Twelve, the trial court erred in admitting evidence found during a search of his motel room and suitcase, over appellant's timely objection.

On original submission, appellant raised twelve points of error. This Court addressed and overruled appellant's Point of Error Number Three, in which he contended the trial court erred in not granting his motion for instructed verdict because the evidence was insufficient to show complainant was killed during a kidnapping or attempted kidnapping as alleged in the indictment. This Court also addressed and overruled appellant's Point of Error Number Five, in which

he argued the evidence was insufficient to support the jury's affirmative answer to Special Issue number Two of the punishment verdict, i.e., that there was insufficient evidence to support the jury's finding beyond a reasonable doubt as to appellant's future dangerousness.

Our disposition of Points of Error Numbers Three and Five is not disputed by the parties on rehearing and need not be readdressed.

This Court previously held that the search of appellant's residence was illegal and evidence obtained in that search was admitted at trial in violation of Tex.Code Crim.Proc. Art. 38.23, and also held that the error was not harmless beyond a reasonable doubt. In reversing appellant's conviction for the above reason the Court agreed with appellant's Point of Error Number Two. Accordingly, we will address appellant's Point of Error Number Two first.

### A. The Warrantless Search of Appellant's Residence Was Valid Under the Emergency Doctrine

■ Both the Fourth Amendment to the United States Constitution as well as Article I, Section 9 of the Texas Constitution forbid unreasonable searches and seizures. This Court has held that warrantless searches are per se unreasonable unless they fall under one of a few exceptions. *Kelly v. State,* 669 S.W.2d 720 (Tex.Cr.App.), *cert. denied* 469 U.S. 963, 105 S.Ct. 362, 83 L.Ed.2d 298 (1984).

■ The United States Supreme Court, other state courts and this Court have recognized that in very limited situations, an immediate search without a warrant is reasonable because of a risk of injury or death, a risk that would likely be magnified if the search was delayed due to the time involved in obtaining a warrant. See *Bray v. State,* 597 S.W.2d 763 (Tex.Cr.App.1980); *Janicek v. State,* 634 S.W.2d 687 (Tex.Cr.App.1982); *Garcia v. State,* 880 S.W.2d 189 (Tex.App.— Texarkana 1994) pet. ref. 9–21–94. The Emergency Doctrine (also known as the Exigent Circumstances Doctrine) has been formulated to allow immediate warrantless

searches that would otherwise be illegal where there is reasonable cause to believe that, absent an immediate search, serious bodily harm or death may result. In *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Court held that "[n]umerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." *Mincey,* 437 U.S. at 392, 98 S.Ct. at 2413. The Court cited its ruling in *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) in ruling further that "the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Mincey,* 437 U.S. at 393, 98 S.Ct. at 2413.[5]

The Emergency Doctrine has been construed to justify entry into a residence to try to locate an individual who has been reported as missing. *People v. Wharton,* 53 Cal.3d 522, 280 Cal.Rptr. 631, 809 P.2d 290 (1991), *cert. denied* 502 U.S. 1038, 112 S.Ct. 887, 116 L.Ed.2d 790 (1992). The Oklahoma Court of Criminal Appeals held that a warrantless search of a dwelling to discover evidence that could reveal the location of an individual reported as missing is justified under the Emergency Doctrine. *Chaney v. State,* 612 P.2d 269, 277 (Okla.Crim.App.1980), *cert. denied* 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed.2d 219 (1981). In *United States v. Johnson,* 9 F.3d 506 (6th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 2690, 129 L.Ed.2d 821 (1994), a warrantless search by police responding to a report of a burglary was found by the court to be justified on exigent circumstances grounds as they observed, upon arrival at the scene of the reported crime, broken windows and individuals moving around inside the residence who failed to identify themselves. A subsequent warrantless entry by the police bomb squad and federal law enforcement personnel was justified on the same grounds because the initial warrantless search discovered, in plain view, what appeared to be a pipe bomb plus items used to make a pipe bomb, and there was a good-faith reason for the officers to believe the potential presence of an explosive device represented a threat to public safety (the premises were located in a residential neighborhood).

The Seventh Circuit found a warrantless search of a crack house to be lawful as it was based on a report that a teenage girl might be there under circumstances indicating she was being held there against her will. *United States v. Hughes,* 993 F.2d 1313 (7th Cir.1991). Other courts have held warrantless searches to be permissible under the Emergency Doctrine where the police had reason to believe kidnapped children were in defendant's home and defendant had a rape record, *State v. Stevens,* 311 Or. 119, 806 P.2d 92 (1991); and where the police had reason to believe an injured woman was inside premises whose door was ajar and blood was on the floor near the entrance, *Oken v. State,* 327 Md. 628, 612 A.2d 258 (1992).

■ We have used an objective standard of reasonableness in determining whether a warrantless search is justified under the Emergency Doctrine. This objective standard of reasonableness used in evaluating the police's conduct takes into account the facts and circumstances known to the police at the time of the search. *Garcia v. State,* 827 S.W.2d 937 (Tex.Cr.App.1992); *Janicek,* at 691. In the instant case, in order to determine whether the warrantless search by the Kingsville Police was reasonably based on a belief that an emergency existed, we must take into account the information then available to them.

■ When the officers decided to search appellant's home without a warrant, the following facts were known to them:

(1) Complainant had been missing for over two days;

(2) Appellant was acquainted with complainant and her car had been found, un-

---

5. We have also held that if the police are already in a building pursuant to the Emergency Doctrine, evidence in plain view may be seized. *Bass v. State,* 732 S.W.2d 632 (Tex.Cr.App.1987).

locked and with her purse in plain view, parked near his residence in an area where she never parked according to her boyfriend;

(3) Complainant was observed on the morning of her disappearance driving near appellant's residence;

(4) Six weeks earlier, another young lady reported to the police that appellant lured her to his house and attempted to assault her;

(5) Complainant was wearing a red blouse when last seen;

(6) A suitcase abandoned by appellant contained what appeared to be a piece cut from a red blouse which appeared to have a bloodstain on it as well as other cut-up women's clothing, a pair of scissors and a piece cut from a pair of blue pajama pants.[6]

(7) A report from Judge Bennett who, on his own, entered appellant's residence (Judge Bennett is appellant's uncle) and who reported finding part of a pair of blue pajamas, other cut-up women's clothing and evidence of a "violent struggle" in the master bedroom.

Captain Gomez testified that Judge Bennett told him "you need to get in there." Captain Gomez was given no reason to believe Judge Bennett had conducted an exhaustive search of the house so as to exclude the possibility that complainant was somewhere on the premises.

Taking into account all of the above information, a reasonable police officer could conclude that an emergency existed and that there was a reasonable possibility that complainant was injured, in need of assistance, and possibly located somewhere in appellant's residence (or information as to her whereabouts could reasonably be expected to be uncovered by a search of appellant's residence). The police had no reason to believe complainant was already dead at that point in time, which would have eliminated the emergency.

At the suppression hearing, Captain Gomez testified as follows:

(Prosecutor) Okay. You weren't looking for—What you went in and were looking for was a body, wasn't it?

(Capt. Gomez) No. No, sir. I was not looking—I was hoping to find the young girl alive, sir.

Q. You were looking for a person.

A. I was looking for a person, yes, sir.

Captain Gomez then testified:

Q. I believe you noted in your reports, "I also saw several strands of hair, including a long single strand of brown hair."

A. That's correct.

Q. Well, did you feel that this was unusual?

A. Unusual, sir?

Q. Yes, sir. Why did you make note of it?

A. Because it was a single strand of long—well, I only found the one. I'm not sure of later the lab found any more. When I found that long strand of brown hair, because of the red cloth, the blood, the scissors, the address, the person who checked in the motel and now the long strands of brown hair, I had to find Richard Brimage, Jr., sir.

Q. Why?

A. Because I was afraid that if this girl was being held against her will, somewhere, she needed to get away or rescued. I didn't know if she was in that house or not, sir.

█ In *Alvarado v. State*, 853 S.W.2d 17 (Tex.Cr.App.1993), this Court, citing *Meek v. State*, 790 S.W.2d 618 (Tex.Cr.App.1990), held: "At a suppression hearing, the trial judge is the sole judge of the credibility of the witnesses and of the weight attributable to those witnesses. The judge may believe or disbelieve all or any part of a witness's testimony. His findings should not be disturbed absent a clear abuse of discretion." *Alvarado*, at 23.

Given the information known to the police at the time and based on the above excerpts from the testimony of Captain Gomez at the

---

**6.** Appellant contends in point of Error Number 12, that the search and seizure of the suitcase was invalid. This contention is addressed later in this opinion.

suppression hearing, there was sufficient evidence for the trial court to find that the warrantless search of appellant's residence was objectively reasonable under the Emergency Doctrine, the intent of the search being to locate complainant or, alternatively, to find evidence hopefully leading to the discovery of complainant at a different location.

◼ Once the police officers entered appellant's residence under the Emergency Doctrine to look for complainant or for evidence of her whereabouts, they were justified in opening the trunk of appellant's parents' car and seizing complainant's body. Consistent with the United States Supreme Court's holding in *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), the search of the garage itself is lawful as it was attached to the residence—the search of which was lawful under the Emergency Doctrine—and thus part of the premises which could be searched pursuant to same.

◼ This Court has held that the lawfulness of an emergency search terminates once the emergency ends. *Bray v. State*, 597 S.W.2d 763, 764 (Tex.Cr.App.1980). Thus, it is clear that the items of evidence discovered prior to location of complainant's body were properly seized under the Emergency Doctrine. Furthermore, the police, upon discovering a potential homicide scene, may make a warrantless search of the premises to see if there are other victims or if the killer is somewhere on the premises. *Mincey v. Arizona*, 437 U.S. at 392, 98 S.Ct. at 2413.

◼ In the present case, the police continued to search appellant's residence after finding complainant's body. The record indicates the items seized and later admitted at trial—the cut up women's clothing, the green shorts, the bloodstains—were in plain view of the police as they searched for complainant, or once her body was located, as they searched places where additional victims could have been hidden. We conclude, therefore, that complainant's body and the evidence seized from appellant's residence during the search for complainant (or for clues as to complainant's whereabouts) or potential additional victims was lawfully seized under the Emergency Doctrine and thus the trial court did not abuse its discretion in ruling the evidence was admissible at trial. Point of Error Number Two is overruled.[7, 8]

B. The Trial Court Did Not Err in Finding Appellant's Confession To Be Voluntary and Did Not Err in Not Making Findings of Fact And Conclusions of Law As to the Voluntariness of Appellant's Confession

◼ In Point of Error Number Six, appellant avers the trial court erred in failing to suppress, over his timely objection, appellant's confession on the ground that it was not voluntary. In related Point of Error Number Seven, appellant claims the trial court erred in failing to make findings of fact and conclusions of law on the voluntariness of appellant's confession despite appellant's request that it do so.

The record shows appellant was arrested on October 9, 1987 at about 4:00 a.m. Officer Cook testified he appeared to be calm, lucid and alert, and he was read his rights from a "Miranda Card" by Officer Cook. He was transported to the Nueces County Jail a few minutes later. He then became upset and made incriminating statements (no questions

---

7. Because we find that the search of appellant's residence was valid under the Emergency Doctrine, we need not address appellant's claim that the items seized as a result of the search, the arrest warrant, appellant's confession, and Leo Molina's testimony should all be suppressed as fruits of an illegal search pursuant to the United States and Texas Constitutions, and Tex.Code Crim.Proc. Art. 38.23. As we have upheld the validity of the search of appellant's residence under the Emergency Doctrine, we need not address whether the police reasonably relied on apparent authority when they conducted said search. Finally, we need not address, at this

time, the State's contention that the evidence seized at appellant's residence would have, in any event, been admitted under the Inevitable Discovery Doctrine, and that we should review our plurality opinion in *Garcia v. State*, 829 S.W.2d 796 (Tex.Cr.App.1992).

8. In his concurring opinion, Judge Baird cites our holding in *Corbett v. State*, 493 S.W.2d 940 (Tex.Crim.App.1973), as authority in support of our holding that the search of appellant's residence was valid under the Emergency Doctrine. We agree.

were asked) on his own initiative to jail counselor Kiki Rodriguez.

Investigator Munoz administered "Miranda" warnings to appellant again at 7:00 a.m. Appellant voluntarily gave his written confession, which, on each page, had at the top the statutory warnings (acknowledged in writing on each page by appellant) required under Tex.Code Crim.Proc. Art. 38.22, § 2(a) (1985). Appellant signed the statement, which was admitted as State's Exhibit 235. Appellant was brought before a magistrate at 11:30 a.m. who found him to be calm and understood his rights. Appellant alleged at the suppression hearing that, due to his emotional state, his actions in deciding to make a statement were not voluntary.

The trial court found that "although defendant may have been upset at the time he was in custody, he was not so upset or otherwise disoriented that his actions in deciding to make a statement either [sic] to Mr. Munoz were not voluntary." The court also found that appellant was not coerced, threatened or improperly induced to make a statement.

"Because the trial court is the sole trier of fact at a hearing on a motion to suppress, this Court is not at liberty to disturb any finding which is supported by the record ... we accordingly defer to those determinations." *Green v. State,* 615 S.W.2d 700, 707 (Tex.Cr.App.1980), *cert. denied* 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981). See also *Alvarado v. State,* 853 S.W.2d 17 (Tex. Cr.App.1993); *Smith v. State,* 779 S.W.2d 417 (Tex.Cr.App.1989). Appellant fails to show any abuse of discretion by the trial court and the record amply supports its findings. Appellant fails to show he was prejudiced by not being brought before a magistrate prior to being interviewed by Investigator Munoz. Appellant fails to present evidence of any police misconduct or coercion related to his confession that would support his claim of involuntariness. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Appellant's Point of Error Number Six is overruled.

The trial court made findings of fact and conclusions of law relating to appellant's confession, and signed them on June 1, 1988. They are included as part of a supplemental transcript which was forwarded to this Court.

Appellant's Point of Error Number Seven is overruled.

C. The Admission of the Opinion Testimony Of Dr. Rupp Was Not Error (Point of Error Number Eight)

 Dr. Joseph Rupp testified at trial as the medical examiner who performed the autopsy on complainant's body. During his testimony the prosecutor asked:

Prosecutor: When one has placed a sock that far down someone's throat, does that indicate to you a conscious objective to cause death?

Defense Counsel: Your Honor, I'm going to object, that calls for a legal—ultimate legal conclusion by Dr. Rupp, and further it is not a proper question; it's not within his area of expertise to speculate on what anyone's conscious objective is.

The trial court overruled the objection and defense counsel noted an exception. Thereupon Dr. Rupp, after the jury was instructed they were free to accept or reject any opinion of his, gave the following answer: "My opinion is that all three were calculated to cause death. The manual strangulation, the sock shoved all the way into the—the throat, and the ligature around the neck were all calculated to produce death." Defense counsel did not again challenge Dr. Rupp's answer by either an objection or motion to strike.

Dr. Rupp did not answer the question to which the objection was made as his opinion related to all three causes of death. Dr. Rupp was clearly qualified to offer opinion testimony as to the cause of complainant's death. *Mays v. State,* 563 S.W.2d 260 (Tex. Cr.App.1978). Appellant fails to show any harm or prejudice resulting from the trial court's action allowing the State to ask the objected-to question which Dr. Rupp did not answer; appellant's failure to object to the subsequent answer itself constitutes waiver as to any complaint as to its admissibility now.

Point of Error Number Eight is overruled.

D. The Trial Court Did Not Err in Failing to Respond To Appellant's Timely Request to Instruct the Jury As to What To Do If It Could Not Unanimously Answer A Special Issue In the Affirmative or If Less Than Ten Jurors Answered A Special Issue in the Negative (Point of Error Number Nine)

██ Prior to submission of the charge on punishment to the jury, appellant requested that the following instruction be included: "If there is any special issue on which the vote of the jurors is not unanimously 'yes,' or not at least ten in favor of an answer of 'no,' then there shall be no answer for that special issue, and the presiding juror shall not sign his name to any answer for that special issue." The trial court denied appellant's request and overruled appellant's objection to the punishment charge.

This Court has previously ruled that appellant's requested instruction is not required. *Ellis v. State*, 726 S.W.2d 39 (Tex.Cr.App. 1986), *cert. denied* 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987). Appellant concedes this fact on page 38 of his Brief on Direct Appeal. Appellant does not present any compelling reasons for us to reexamine our holding in *Ellis*.

Point of Error Number Nine is overruled.

E. The Trial Court Did Not Err in Receiving Into Evidence Certain Items of a Sexual Nature, Nor Did Their Admission Result in Unfair Prejudice to Appellant

Appellant was originally indicted for capital murder alleged to have been committed during the course of an aggravated sexual assault and during the course of a kidnapping. The portion of the indictment relating to the allegation of aggravated sexual assault was struck on the first day of the trial and the State proceeded solely on the allegation that the murder occurred in the course of committing or attempting to commit kidnapping.

██ At trial, the State, over appellant's objection, was permitted to introduce into evidence various items found in a motel room rented by appellant and from his residence. These items included: pornographic magazines, a cylindrical object, a jar of cold cream, a T-shirt and towel with semen stains, a razor and a can of shaving cream and a piece of leather with holes cut in it and pieces of clothing attached to it, described by the State as a sexual device. Appellant objected as each item was offered, on the grounds that they were not relevant and that their inflammatory nature outweighed their probative value. The trial court overruled appellant's objections. In Point of Error Number Eleven, appellant contends these items were improperly admitted.

The complained of items were relevant with respect to the kidnapping element. Appellant's own confession states: "I wanted her sexually real bad. And that is why I lured her to the house ... After I was certain she was dead, tied up, I took off her shorts so I could admire her body." Appellant's admissions clearly support the inference that he kidnapped complainant to force her to have sex with him and when she refused he killed her. The complained-of items tend to corroborate that appellant's motive in kidnapping complainant was sexual in nature.

Tex.Rule Crim.Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The complained-of items are "relevant evidence" because they tend to show motive and therefore assisted the jury in drawing an inference that appellant had a motive for committing the kidnapping that was part of the offense of capital murder for which he was convicted. *Calverley v. State*, 511 S.W.2d 60 (Tex.Cr. App.1974), overruled on other grounds by *Moosavi v. State*, 711 S.W.2d 53 (Tex.Cr.App. 1986); *Lassere v. State*, 458 S.W.2d 81 (Tex. Cr.App.1970), *cert. denied* 401 U.S. 920, 91 S.Ct. 906, 27 L.Ed.2d 822 (1971).

██ We have held that Tex.Rule Crim.Evid. 403 favors admission of relevant evidence and implies a presumption that relevant evidence will be more probative than prejudicial. *McFarland v. State*, 845 S.W.2d 824 (Tex.Cr.App.1992), *cert. denied* 508 U.S.

963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993). We have also held that Rule 403 requires exclusion of evidence only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value. *Joiner v. State,* 825 S.W.2d 701 (Tex.Cr.App.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 3044, 125 L.Ed.2d 729 (1993). Appellant does not offer any evidence to support his contention that the items described above were unduly prejudicial, inflamed the jury, or that their relevance was substantially outweighed by their prejudicial effect. We have also held that questions of admissibility of evidence under Tex.R.Crim. Evid., Rules 402–404, are assigned to the trial court and are reviewable on appeal only for abuse of discretion. *Coffin v. State,* 885 S.W.2d 140, 149 (Tex.Cr.App.1994). See also *Narvaiz v. State,* 840 S.W.2d 415, 429 (Tex. Crim.App.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791. Appellant fails to show such an abuse of discretion. We overrule appellant's Point of Error Number Eleven.

F. The Evidence of the Arrest of Appellant, And the Fruits Thereof, Were Admissible As the Arrest Was Made Pursuant to a Constitutional Arrest Warrant Issued by a Neutral and Detached Magistrate

■ In Point of Error Number Ten, appellant asserts that the arrest of appellant was made pursuant to an unconstitutional arrest warrant and, therefore, the evidence of that arrest, and the fruits thereof, should have been suppressed by the trial court as per appellant's motion to suppress.

■ Following discovery of the body of complainant, Kleberg County Justice of the Peace Bigger was summoned to the crime scene. Judge Bigger commenced an inquest pursuant to Tex.Code Crim.Proc. Chapter 49 (1987), observed the crime scene, and took control of the premises and the investigation. Judge Bigger then issued an arrest warrant for the appellant for the offense of capital murder based on his investigation and an affidavit filed by the police.

Tex.Code Crim.Proc. Art. 49.19 (1987) provides:

(a) a justice of the peace who is conducting an inquest of a death under this subchapter may issue a warrant for the arrest of a person suspected of causing the death if:
(1) the justice has knowledge that the person caused the death of the deceased;
(2) the justice receives an affidavit stating that the person caused the death; or
(3) evidence is adduced at an inquest hearing that shows probable cause to believe the person caused the death.

Judge Bigger acted within the scope of his duties as a justice of the peace in performing duties imposed on him by Tex.Code Crim. Proc. Art. 49. Moreover, the record does not support appellant's position that Judge Bigger was acting as a law enforcement officer or a prosecutor. Appellant's reliance on *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) is misplaced. In *Coolidge,* the attorney general of New Hampshire issued a search warrant in a homicide case in which he took charge of the entire investigation, including all police activities. He later served as chief prosecutor at the trial. Given this, the Supreme Court held that the attorney general was not a neutral and detached magistrate, rendering the search warrant constitutionally defective under the Fourth Amendment.

Judge Bigger did not direct the police investigation in the present case and had no role in its prosecution. Judge Bigger's exposure to evidence of the murder did not limit his neutrality or detachment. See *Shadwick v. City of Tampa,* 407 U.S. 345, 350, 92 S.Ct. 2119, 2124, 32 L.Ed.2d 783 (1972). The trial court, in its order, found that, by implication, Judge Bigger possessed the necessary neutrality and detachment at the time he issued the arrest warrant to meet the requirements of the Texas and United States Constitutions. We find no abuse of discretion by the trial court; the record shows Judge Bigger relied on both personal knowledge and the police affidavit in issuing the warrant for appellant's arrest.

Point of Error Number Ten is overruled.[9]

9. Because we find that the arrest was made pursuant to a valid arrest warrant, we need not

G. Evidence Obtained as a Result of a Search of Appellant's Motel Room and a Suitcase Found There Was Properly Admitted In Evidence Against Appellant as Abandoned Property.

 In Point of Error Number Twelve, appellant avers the trial court erred in overruling his motion to suppress evidence found in a search of his room at the Rodeway Inn. The record shows that appellant checked into room 119 at the Rodeway Inn during the evening of October 6, 1987. He paid cash for a one night stay. Check out time was noon. Appellant did not check out the next day. The maid found the room empty at 11:55 a.m. except for papers on the desk and a closed suitcase. The room key was on the dresser. The maid checked the room again at 2 p.m. and 3 p.m.; after the 3 p.m. check the front desk clerk instructed the maid to put the papers into the suitcase and bring it to the front desk. This was done. That evening, Captain Gomez of the Kingsville Police, received a message to go to the Rodeway Inn. He did so and, once there, proceeded to open the suitcase which he then knew belonged to appellant. There is no evidence appellant ever inquired as to the whereabouts of the suitcase or the papers at or after checkout time on October 7, 1987.

At the conclusion of the suppression hearing, the trial court found appellant failed to establish standing to object to the search, finding that he had no legitimate expectation of privacy in the place searched and the items searched and seized. In effect, the trial court found he had abandoned the room and the contents therein.

 We have held that an abandonment of property occurs if (1) the defendant intended to abandon the property and (2) his decision to abandon the property was not due to police misconduct. *Comer v. State,* 754 S.W.2d 656 (Tex.Cr.App.1988); *Hawkins v. State,* 758 S.W.2d 255 (Tex.Cr.App.1988). In *United States v. Parizo,* 514 F.2d 52 (3rd Cir.1975) the court held:

When the terms of a guest's occupancy of a room expires, the guest loses his exclu-sive right to privacy in the room. The manager of a motel then has the right to enter the room and may consent to a search of the room and the seizure of the items there found.

*Parizo* at 54, citing *United States v. Croft,* 429 F.2d 884 (10th Cir.1970). While this Court is not bound by these two decisions, their logic is sound and should be applied to the present case.

As the record supports the trial court's finding that appellant abandoned the motel room voluntarily and his decision was not due to any action by the police, we find no. abuse of discretion in the denial of appellant's motion to suppress the items found in room 119.

Point of Error Number Twelve is overruled.

H. The Trial Court Did Not Err in Ordering a Transfer of Venue, On Its Own Motion, From Kleberg County To Comal County Over Appellant's Objection. Furthermore, Appellant Does Not Show Error in the Trial Court's Handling of Media Conduct During The Trial (Points of Error Numbers One and Four)

 On November 18, 1987, the trial court, on its motion, ordered a hearing to consider a change of venue pursuant to Tex. Code Crim.Proc. Art. 31.01. The purpose of the hearing was to determine if a fair and impartial trial could be held in Kleberg County, or in the 105th Judicial District (the 105th Judicial District includes Nueces, Kleberg and Kenedy Counties), or in any county in an adjoining judicial district, or to a county beyond an adjoining district. The notice of the hearing was given to both the State and appellant on November 18, 1987.

The hearing was held on December 4, 1984. Eighteen witnesses, including several members of the Corpus Christi area print and electronic media, testified. Many exhibits were introduced into evidence showing the audience size and geographic areas covered by the English and Spanish language television and radio stations and the newspa-

address appellant's argument that the "fruits" of the arrest were inadmissible in evidence against

the appellant.

pers, located in the Corpus Christi area. The testimony and the exhibits show that this case received intensive coverage from the media commencing at the time complainant was reported as missing.

The court found that a fair and impartial trial could not be held in Kleberg County, the 105th Judicial District or in an adjoining judicial district and ordered a transfer of this matter to Comal County, roughly 125 miles away. Appellant, it should be noted, did not demand to be tried in Kleberg County. The court also found that neither party had filed a motion objecting to a change of venue from Kleberg County within ten days of the November 18, 1987 notice of a hearing on whether a change of venue should be ordered, the period of time for filing such a motion pursuant to Tex.Code Crim.Proc. Art. 31.01.

Appellant filed written objections to the December 4 order transferring venue to Comal County. A hearing on these objections was held on December 19, 1987. The court overruled appellant's objections, ruling, in effect, appellant's evidence that he could receive a fair trial in an adjoining judicial district or the same judicial district was outweighed by evidence to the contrary introduced at the December 4, 1987 hearing.

▆▆▆▆ In *Cook v. State*, 667 S.W.2d 520 (Tex.Cr.App.1984) we held: "When the Legislature modified the language of Article 560 in enacting Art. 31.01, its purpose was evidently to require a court, once satisfied that a fair trial cannot be had, to give notice to both parties of its intention to change venue and to hold a hearing allowing either party to offer evidence either in support of or against the court's proposed change in venue. The statute does not require the court to offer evidence in support of its own motion, but rather merely offers the parties a chance to be heard on the matter. The court is only required to state in its order the grounds for its decision to change venue." *Cook* at 522. In citing *Spriggs v. State*, 163 Tex.Crim. 167, 289 S.W.2d 272 (1956), we stated "[T]hat since the statute allows the court to satisfy itself from any cause that a fair trial cannot be had, 'it would be difficult to envisage a

state of facts by which this Court would be warranted in finding that an abuse of discretion has occurred.'" *Cook* at 523. See also *Aranda v. State*, 736 S.W.2d 702 (Tex.Cr. App.1987), *cert. denied* 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988), where we held the trial court, in a case also involving massive pretrial publicity, did not abuse its discretion ordering, after a hearing, a transfer of venue on its own motion. We have also held that the trial court's decision on a change of venue may result in a reversal on appeal only for abuse of discretion. *Narvaiz, supra*, at 428.

In the present case, the trial court balanced evidence of possible bias created by significant pretrial publicity in the 105th Judicial District and surrounding judicial districts with contrary evidence produced by appellant. Appellant fails to show that the trial court abused its discretion in ordering a change of venue, in effect, its giving more weight to the evidence introduced at the December 4 hearing. Appellant received his required notice and hearing provided him under Art. 31.01; he was entitled to no more. Point of Error Number One is overruled.

▆▆▆▆ In Point of Error number Four, appellant claims the failure of the court to control the behavior of the media during pretrial proceedings and the trial itself resulted in denial of appellant's due process rights under the United States and Texas Constitutions. The record does not reflect any motions by the appellant asking the court to curb or control media activities or citing any specific activities to which he objected. The record does show that counsel did report an attempt by an unnamed San Antonio reporter to interview a witness after he had been placed under the rule. Tex. Code Crim.Proc. Art. 36.06. It is not known whether this interview took place, but, in any event, appellant fails to show any harm resulted.

The record shows there was heavy media coverage of both the pretrial proceedings and the trial itself. The court itself recognized this when it, on its own motion, ordered a change of venue (paradoxically, appellant objected to the change of venue) to Comal

County to escape the massive publicity generated in and around Corpus Christi. The incidents cited by appellant, however, are not shown by appellant to have tainted his trial. No evidence is presented that the media activity prejudiced the jury or any member of the jury against appellant. Appellant did not make a motion to sequester the jury to minimize its exposure to publicity concerning the trial. The record indicates the court corrected the problem concerning the potential interview of the witness who was under the rule.

The trial court, in its instructions to the jury panel at the beginning of trial, instructed the jury to avoid newspaper, radio and television coverage concerning the trial; indeed the court ordered the jury: "To play it safe, I again instruct you, do not read any newspaper, do not watch any TV news, do not listen to any radio news broadcasts. We do not want to declare a mistrial and try the case a second time because a juror learned something about the case by reading the newspaper or watching TV or listening to the radio." No evidence that any juror violated these instructions was introduced during defendant's motion for a new trial.

■■■ The First Amendment to the United States Constitution places few limits on the right of the press—print or electronic—to cover public trials. We acknowledge that the media does not always behave or use restraint. See *Bird v. State*, 527 S.W.2d 891 (Tex.Cr.App.1975) (reversed due to improper comments of the prosecutor). We do not find the media's behavior in the present case resulted in denial of appellant's due process rights under either the United States or Texas Constitutions.

Point of Error Number Four is overruled.

Having found no reversible error, we affirm the judgment of the trial court.

CLINTON, J., dissents for reasons given and disposition made in opinion, on original submission.

OVERSTREET, J., dissents.

BAIRD, Judge, concurring.

Alexander Pope once said that a man should not be ashamed to admit when he was wrong, because such an admission merely says that he is wiser today than yesterday. *Thoughts on Various Subjects; published in Swift's Miscellanies* (1727). Hopefully, this is especially true for judges. For the following reasons, this opinion is such an admission and I reverse my original position.

On original submission, I was among a majority who found the search of appellant's home illegal and reversed the judgment of the trial court. *Brimage v. State*, 918 S.W.2d 466 (Tex.Cr.App.1994). Four judges dissented, believing the search was permissible under the emergency doctrine. Today, the majority adopts that position. After carefully reviewing *Corbett v. State*, 493 S.W.2d 940 (Tex.Cr.App.1973), I now believe the entry into appellant's home was permissible under the emergency doctrine.

In *Corbett, supra,* the police received a telephone call. The caller stated Corbett killed the victim, the body was in Corbett's home, but Corbett would be returning to dispose of the body. The police drove to Corbett's home and noticed a light burning. They telephoned Corbett's home but no one answered. The police returned to the home, found the front door unlocked, entered and discovered the victim's body. Corbett was arrested after he returned to his home and placed the victim's body in a wooden box. *Id.,* 493 S.W.2d at 943–944.

At trial, Corbett attempted to suppress the evidence obtained in the searches of his home, contending the initial entry was illegal. *Id.,* 493 S.W.2d at 945. We noted that the practical need for quick response by public officials sometimes outweighs even the imposing right of citizens to privacy and protection from unreasonable or warrantless searches. *Ibid.* The Court stated the report of a homicide or the existence of circumstances in which an unnatural death could have occurred may constitute an emergency. Under such circumstances the police have the duty to act forthwith without questioning the accuracy of their information. *Id.,* 493

S.W.2d at 947 (quoting *Patrick v. State*, 227 A.2d 486, 489 (Del.Super.1967)).

Neither of the parties cited *Corbett* on original submission and apparently no member of this Court found *Corbett* when conducting their independent research. Nevertheless, I find it controlling. In the instant case, the investigation of the victim's disappearance led the police to suspect appellant who had previously lured another young woman to his home and attempted to sexually assault her. The victim knew appellant and was last seen, wearing a red blouse, near his home. The evening before the search appellant stayed in a local hotel and departed without his luggage. Inside his luggage the police discovered: bloody scissors, a piece of red cloth, and cut-up pieces of women's clothing, including a piece of pajama pants. Appellant's uncle, Judge Bennett, broke into appellant's home, and informed police there was evidence of a violent act in the back bedroom. Further, Judge Bennett stated he had observed a cut piece of pajama pants which appeared to match those the police recovered from appellant's luggage. Judge Bennett told the police: "[y]ou need to get in there."

There are circumstances which vitiate the need for quick response by the police and take the problem completely out of the emergency context. *Corbett*, 493 S.W.2d at 947. Indeed, the United States Supreme Court in *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413–2414, 57 L.Ed.2d 290 (1978), held homicide scenes do not categorically present emergency situations. Similarly, the *Corbett* Court noted that police entering a house because they detected the odor of a decomposing body would not constitute an emergency. *Corbett*, 493 S.W.2d at 947 (Citing, *Condon v. People*, 176 Colo. 212, 489 P.2d 1297 (1971)).

However, those circumstances are not extant in the instant case. Here, the evidence available to the police at the time they entered appellant's home indicated a possible emergency. The items recovered from appellant's luggage indicated possible injury. Judge Bennett broke into appellant's home and observed evidence of a violent scene, including the remainder of the pajama pants which had been discovered in appellant's luggage. Further, Judge Bennett's statements were consistent with an emergency in the home. In short, this is a situation where peace officers are authorized to act "forthwith upon the report of the emergency—not to speculate upon the accuracy of the report." *Corbett*, 493 S.W.2d at 947.

With these comments, I join only the judgment of the Court.

MEYERS, J., joins this opinion.

MALONEY, Judge, concurring.

On original submission the Court rejected the State's argument that the warrantless search was justified by exigent circumstances. On rehearing the Court upheld the search based upon exigent circumstances. I concur in the judgment of the Court on rehearing, but write separately to point out that the opinion on original submission failed to apply the appropriate legal standard. Both opinions recognize that the facts should be viewed under an objective standard when determining whether exigent circumstances justify a warrantless search. *Op. on original submission* at 482 ("Courts must use an objective standard of reasonableness in assessing the officers' belief that such an emergency actually existed"); *Op. on reh'g* at 502 (objective standard of reasonableness is used in evaluating the police's conduct). However, the opinion on original submission applied a *subjective* standard by looking to the actual views of the officers in the case. *Brimage*, 918 S.W.2d at 482–483 (opinion on original submission) (holding that record supports no exigency because police characterized search as evidentiary, decision to search was arrived at casually, police were not expecting to find alive or injured victim). When viewed under the appropriate objective standard I agree that the warrantless search was lawful as based upon exigent circumstances. I therefore concur in the judgment of the Court.